McCABE/MARRA COMPANY, Appellee/Cross-appellant,

v.

CITY OF DOVER et al., Appellant/Third-party plaintiff; Aetna Casualty and Surety Company, Third-party defendant/Appellee/Cross-appellant.

[Cite as *McCabe/Marra Co. v. Dover* (1995), 100 Ohio App.3d 139.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 66798.

Decided Jan. 9, 1995.

142

143

*Norman A. Fox, Jr.,* for appellee/cross-appellant.

*Stacy D. Ballin* and *Frederick G. King,* for defendant-appellant/third-party plaintiff.

*Arter & Hadden, Irene C. Keyse–Walker, Barry J. Miller* and *Sonali B. Wilson,* for third-party defendant/appellee/cross-appellant.

DONALD C. NUGENT, Judge.

This is an appeal and cross-appeal from a final judgment of the Cuyahoga County Court of Common Pleas. Defendant-appellant/third-party plaintiff, the city of Dover ("the city"), appeals from the decision of the trial court granting a motion for a directed verdict made at the close of the city's opening statements in

favor of the plaintiff-appellee/cross-appellant, McCabe/Marra Company ("McCabe"), and the third-party defendant/appellee/cross-appellant, Aetna Casualty and Surety Company ("Aetna"). McCabe and Aetna both defend the trial court's ruling on their directed verdict motions and cross-appeal the trial court's decision overruling their motions for summary judgment.

This action originated on November 13, 1990 upon the filing of a complaint by McCabe seeking damages against the city, SFT, Inc., and Union Carbide Chemicals and Plastics Company, Inc., alleging breach of contract, unjust enrichment, tortious interference with contract, and libel. All claims relevant herein [1] arose from an alleged contract between McCabe and the city whereby McCabe was to purchase, disassemble, transport, remanufacture, reassemble, and install a gas turbine generator at the city's power plant. SFT was the city's electrical engineering consultant, and Union Carbide sold the gas turbine unit for use in the plant.

The city counterclaimed against McCabe, seeking $2.3 million in compensatory damages for breach of contract, negligence, and unjust enrichment. The city added Aetna as "new party counterclaim defendant," seeking $2.3 million in compensatory damages and $10 million in punitive damages for breach of contract in connection with a statutory performance bond Aetna furnished McCabe as principal under the alleged contract with the city. The city also sought damages against Aetna for bad faith in Aetna's nonpayment and handling of the city's claim under the bond.

Following extensive discovery, Aetna and McCabe filed motions for summary judgment on the city's counterclaim. Aetna and McCabe argued that because the city failed to adhere to statutory bidding requirements, no contract between the city and McCabe existed, thereby precluding any relief under the statutory performance bond. Aetna further argued that in the absence of a valid contract, and there being no evidence of malice, the city's bad faith claim against Aetna must also fail. The city opposed the motions on numerous grounds, including the argument that Aetna never raised illegality of contract as an affirmative defense in its pleadings. In response, Aetna sought leave to amend its answer to raise illegality as an affirmative defense. The court denied Aetna's motion for leave to amend its answer and overruled the motions for summary judgment. The case proceeded to trial on June 21, 1993.

Following the city's opening statement, McCabe and Aetna both moved for a directed verdict on the basis that the city's failure to obtain the necessary building permit pursuant to R.C. 3791.04 prevented McCabe from going forward

---

1. McCabe's claims against SFT, Inc. and Westinghouse were dismissed without prejudice during the pendency of the lawsuit.

and installing an enclosure around the gas turbine generator. On that basis, it was claimed that the city breached the contract. After a short recess, the trial court ruled that the contract was void and unenforceable. The trial court dismissed McCabe's complaint as well as the city's counterclaim and third-party claim, noting:

"I think everyone misses the big point that is that the first sentence of the statute said, before entering into a contract you have go[t] to do this.

"This contract was entered into in violation of Ohio Revised Code Section 3791.04. This contract is illegal.

"Ohio courts will leave the parties right where they find them when they enter into a contract illegally.

"The complaint regarding the contract claim is dismissed. The counterclaim of the City of Dover and the third party complaint of the City of Dover is [sic] dismissed."

On July 7, 1993, the city filed a motion for reconsideration and, in the alternative, moved for a new trial and relief from judgment. On July 13, 1993, the trial court entered a nunc pro tunc entry as of and for June 22, 1993. The nunc pro tunc order "revise[d] [the court's] order dated 3–30–93 * * *" and, "in the interest of justice," granted Aetna's motion for leave to file an amended answer to include the defense of invalidity of contract. On August 2, 1993, the trial court entered a second nunc pro tunc entry as of and for June 23, 1993, granting McCabe's and Aetna's motions for a directed verdict.

The August 2, 1993 judgment entry was timely appealed but ultimately dismissed by this court for lack of a final appealable order. Thereafter, the trial court entered the following final, appealable judgment:

"Case called for jury trial. Jury was duly empanelled and sworn. In their opening statement the City of Dover admitted to blatantly violating O.R.C. Section 3791.04 by never obtaining or even trying to obtain a permit required by law. See R.C. § 3791.04. Said conduct by Dover either renders the construction contract at issue unenforceable due to illegality or unenforceable due to failure to meet a condition precedent to the enforcement of the contract. See Security Sewage Equipment Co. v. McFerren, 14 Ohio St.2d 251 [43 O.O.2d 432, 237 N.E.2d 898] (1968). Plaintiff's and Aetna's Motions for Directed Verdict are granted. Dover's Counterclaim and Third Party Complaint are ordered dismissed with prejudice. Court dismisses Plaintiff's contract claim with prejudice. Plaintiff voluntarily dismisses its libel claim. All at the costs of Dover.

"Pursuant to Rule 54(b), the Court hereby enters its final judgment as to Dover's claims, and McCabe's breach of contract claims, and makes an express determination that there is no just reason for delay with respect to this order."

This appeal follows, wherein the city raises the following assignments of error:

"I. The trial court erred in granting plaintiff-appellee's and third-party defendant-appellee's motions for directed verdict after the opening statement of defendant/third-party plaintiff-appellant.

"II. The trial court erred in granting motions for directed verdict on the grounds of illegality of contract when plaintiff-appellee and third-party defendant-appellee failed to plead illegality of contract as an affirmative defense, thereby waiving such defense.

"III. The trial court erred in failing to follow the appropriate standard for granting a motion for directed verdict following the opening statement of a party.

"IV. The trial court erred in issuing a *nunc pro tunc* entry granting third-party defendant-appellee leave to amend its answer to assert, and thereby preserve, an affirmative defense of illegality, when such entry was issued after third-party defendant-appellee had waived its right to raise such affirmative defense, the trial already had concluded, and the trial court already had dismissed third-party plaintiff-appellant's contract claims on the non-pled grounds of illegality of contract."

Additionally, Aetna assigns the following errors on cross-appeal[2]:

"I. The trial court erred in denying the surety's motion for summary judgment where no contract existed between the public owner and principal contractor."

"IV. Should this court remand for trial, the trial court erred in denying the surety's motion in limine to exclude evidence of damages in excess of the penal sum in the statutory performance bond as well as evidence of damages not permitted under the alleged contract."

Finally, McCabe assigns the following errors on cross-appeal:

"I. In the event it is determined that the trial court erred, and claims of appellant are reinstated, then the contract claims of McCabe/Marra Company should also be reinstated.

"II. Cross-appellant McCabe/Marra Company hereby supports and joins in cross-appellant Aetna Casualty & Security [*sic*] Company's assignments of error and issues raised on cross appeal and incorporates said issues and arguments herein by reference."

---

2. Aetna has withdrawn Assignments of Error II and III from this court's consideration.

I

*Appeal by the City of Dover*

A

Because the city's second and fourth assignments of error deal with procedural issues, this court will address them first. In the city's second assignment of error, the city argues that the trial court erred in granting Aetna's and McCabe's motions for a directed verdict when each failed to plead illegality of contract as an affirmative defense, thereby waiving the defense. Next, the city argues, through its fourth assignment of error, that the trial court erred in issuing a *nunc pro tunc* entry granting Aetna's leave to amend its answer to include illegality of contract as an affirmative defense to the city's third-party complaint. In both assignments of error, the city argues Aetna's motion for leave to plead came too late in the proceedings and after the defense was affirmatively waived.

It seems clear to this court that illegality or invalidity of a contract is an affirmative defense that must be set forth in the pleadings or it is waived. *Arthur Young & Co. v. Kelly* (1993), 88 Ohio App.3d 343, 348, 623 N.E.2d 1303, 1306 ("Illegality is an affirmative defense which must be set forth with specificity."). Civ.R. 8(C) provides in relevant part that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively * * * illegality * * * or any other matter constituting an avoidance or affirmative defense." By failing to raise the defense of illegality or invalidity of the contract, it appears both Aetna and McCabe waived this defense. *Gibbons–Grable–Goettle, a Joint Venture v. Northeast Ohio Regional Sewer Dist.* (Jan. 23, 1986), Cuyahoga App. No. 49132, unreported, at 4, 1986 WL 1061.

Aetna responds to the city's argument by arguing that it never alleged, let alone pled, "illegality" of contract before the trial court. Instead, Aetna asserts it moved for a directed verdict on the ground that the contract was invalid or void *ab initio*. Regardless, this court concludes that the defense of invalidity of contract or that the contract was void *ab initio* constitutes an affirmative defense that must be set forth in the pleadings. In *Gibbons–Grable–Goettle, supra*, this court stated that "a claim is an affirmative defense if it admits the facts stated in the complaint, but asserts a further reason why the defendant should not be liable." (Citations omitted.) *Id.* at 4. See, also, *Atelier Design, Inc. v. Campbell* (1990), 68 Ohio App.3d 724, 727, 589 N.E.2d 474, 476 (affirmative defense "admits the claim but asserts some reason in law why the plaintiff cannot recover on it").

In the present case, both McCabe and Aetna admitted, in their answers to the city's claim, the existence of a contract between McCabe and the city. Indeed, McCabe sought recovery for breach of the contract in its complaint that

initiated the present action. The assertion of invalidity of the contract or the assertion that the contract was void *ab initio* merely sets forth a reason why McCabe or Aetna should not be liable for breach of contract. Aetna's attempt to defeat the effect of its pleadings by arguing that it never admitted to entering into a *valid* or *enforceable* contract misses the mark. It is this court's opinion that denial of the "validity" or "enforceability" of a contract is nothing more than an assertion that the party opposing enforcement of the contract should not be liable. Contrary to Aetna's assertion, it is not an attempt to negate an element of a prima facie case for breach of contract. In short, asserting that defense does not contest the existence of an offer, acceptance, consideration, and/or a material breach of the terms of the contract.

Aetna further argues that, pursuant to Civ.R. 12(H), only the affirmative defenses listed in Civ.R. 12(B)(1) through (6) can be waived prior to trial. While this is true, see *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 4, 12 OBR 1, 3, 465 N.E.2d 377, 379–380, this does not mean that an affirmative defense may be raised at any time. The failure to plead an affirmative defense of the type listed in Civ.R. 8(C) results in waiver of the defense, where the affirmative defense is not tried with the express or implied consent of the parties and/or where prejudice to the opposing party results. *Blevins v. Sorrell* (1990), 68 Ohio App.3d 665, 671–672, 589 N.E.2d 438, 441–442; *Spies v. Gibson* (1982), 8 Ohio App.3d 213, 8 OBR 285, 456 N.E.2d 1284.

Civ.R. 15(B) allows an amendment to the pleadings in order to conform to the evidence. A party may raise as an affirmative defense issues which were not raised in the pleadings by implied amendment when an amendment would conform to the evidence and when an issue has been tried by either the express or implied consent of the parties. *Hoover, supra; State ex rel. Evans v. Bainbridge Twp. Trustees* (1983), 5 Ohio St.3d 41, 5 OBR 99, 448 N.E.2d 1159; *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.* (1992), 81 Ohio App.3d 728, 612 N.E.2d 357.

In the present case, Aetna argues that the grounds for voiding the contract between McCabe and the city were raised in summary judgment motions, pretrial discovery, and in Aetna's pretrial brief. However, the trial court overruled Aetna's and McCabe's motions for summary judgment and overruled Aetna's motion for leave to file an amended answer to set forth such defense. The trial court further reiterated, on several occasions prior to trial, its position in not allowing Aetna or McCabe to assert invalidity of contract. Additionally, when the case finally went to trial, it did so on McCabe's breach of contract claim against the city as well as the city's breach of contract claim against McCabe and Aetna. Lastly, we note that an amendment pursuant to Civ.R. 15(B) would have been impossible, since the trial court directed verdicts at the close of opening state-

ments without any evidence having been received. Thus, an express or implied amendment to the pleadings to conform to the evidence could not have been possible.

Therefore, based on the foregoing, we conclude the trial court erred in granting Aetna's and McCabe's motions for a directed verdict at the close of the city's opening statements, where neither Aetna nor McCabe pled illegality of the contract as an affirmative defense. Accordingly, the city's first assignment of error has merit.

■ Subsequently, in an attempt to get around these procedural infirmities, the trial court entered a *nunc pro tunc* entry on July 13, 1993 as of and for June 22, 1993, wherein the trial court granted Aetna's motion for leave to file an amended answer to include the defense of invalidity of contract. The city raises the impropriety of this order in its fourth assignment of error.

The purpose of a *nunc pro tunc* entry was aptly set forth by this court in *Pepera v. Pepera* (Mar. 26, 1987), Cuyahoga App. Nos. 51989 and 52024, unreported, at 4, 1987 WL 8586:

"The purpose of a nunc pro tunc entry is to make the record speak the truth. The function of a nunc pro tunc entry is not to correct or modify an existing judgment, but rather to make the record conform to that which has already occurred. *State, ex rel. Phillips v. Industrial Commission* (1927), 116 Ohio St. 261 [155 N.E. 798]. A court may not by way of a nunc pro tunc entry, enter of record that which it intended or might have made but which in fact was not made. *Webb v. W. Res. Bond & Share Co.* (1926), 115 Ohio St. 247 [153 N.E. 289]. A nunc pro tunc entry does not extend beyond the power to make the original Judgment Entry speak the truth. *Reinbolt v. Reinbolt* (1925), 112 Ohio St. [526, 147 N.E. 808]."

As in *Pepera*, the *nunc pro tunc* entry of July 13, 1993 did not correct or modify an existing judgment so that the judgment "spoke the truth." Rather, the July 13, 1993 judgment entry substantially altered that which had taken place on June 22, 1993 when the trial court announced its intention to grant a directed verdict. Moreover, and of greater importance, such entry substantially altered the court's earlier judgment that overruled Aetna's motion for leave to amend its complaint to include the defense of invalidity of the contract.

In short, the trial court used the *nunc pro tunc* entry to modify its previous orders. For the trial court to have granted a directed verdict at McCabe's and Aetna's request on the day of trial after having repeatedly held that Aetna and McCabe could not raise such defense constitutes prejudicial error under the present circumstances. The city's second and fourth assignments of error have merit.

B

Notwithstanding the pleading infirmities identified above, this court will next consider the city's first and third assignments of error which contest the substantive merits of the lower court's ruling.

The city argues that the trial court applied an incorrect standard of review in granting a directed verdict at the close of the city's opening statement. The city further argues the trial court erred as a matter of law in concluding that the failure to obtain a building permit in violation of R.C. 3791.04 rendered a contract for the purchase, delivery, and installation of a gas turbine generator illegal and/or unenforceable.

Civ.R. 50(A)(1) provides that a motion for directed verdict may be made on opening statement of the opponent. Civ.R. 50(A)(4) controls:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

A court should exercise great caution in directing a verdict following the opening statement of counsel. *Vitanza v. First Natl. Supermarkets, Inc.* (June 24, 1993), Cuyahoga App. No. 62906, unreported, at 18, 1993 WL 226576. In ruling on a motion for a directed verdict, a trial court must construe the statements of counsel and the admissions in the pleadings and the record in a light most favorable to the party against whom the motion is made to determine whether there is substantial evidence to support a cause of action, and if reasonable minds can reach different conclusions, the motion must be denied. *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 70 O.O.2d 424, 325 N.E.2d 233; *Job v. Cleveland Dance Ctr.* (1989), 62 Ohio App.3d 678, 577 N.E.2d 396; *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 531 N.E.2d 333. Furthermore, a motion for a directed verdict must state with specificity the grounds advanced therefor. Civ.R. 50(A)(3).

In counsel's opening statement, counsel for the city represented that in April 1989, the city and McCabe entered a contract, wherein McCabe agreed to acquire, install, and make operational a complete gas turbine generator for its municipal power plant. McCabe agreed to provide and furnish all labor, materials, and equipment, and all services that were required to be performed and completed in a workmanlike manner, and deliver, erect, and place into service one used remanufactured gas turbine generator, as well as all auxiliary equipment.

It was further represented that McCabe agreed to provide and design a building enclosure around the gas turbine generator. McCabe, it was claimed, was responsible for the design, details and performance of the system.

According to the city's counsel, the contract also provided that McCabe was responsible for the building enclosure to conform to any applicable building standards and safety codes. McCabe was additionally responsible for obtaining any government permits relating to the equipment.

In return, the city was to pay McCabe $2 million total on the contract. Counsel represented that McCabe was paid approximately $1,931,000 before it left the job. Counsel further stated that throughout the term of the contract, McCabe failed to timely perform, despite the city's good faith attempts to work with the company. McCabe consistently made excuses, unreasonable demands, and demands for more money to complete the contract.

On September 4, 1990, McCabe ordered its people off the job site without providing notice or warning to the city. Counsel explained that throughout the summer of 1990, McCabe was given numerous notices and directions to proceed with the project and cure its failure to perform. However, it was stated McCabe was not going to complete the contract unless it got more money.

At some point during construction, McCabe raised the issue of whether the gas turbine generator should be protected with an explosion-proof enclosure. Counsel for the city, however, represented that it was McCabe's responsibility to decide what to do and to do it within the contract price. Nonetheless, McCabe sought the city's advice. The city responded by informing McCabe that the insurance companies did not require explosion-proof controls around the turbine and that the city's engineers, SFT, Inc., had also contacted the manufacturer, Westinghouse, which responded that explosion-proof controls were not needed.

The city's representations apparently did not satisfy McCabe, which later sought a ruling from the State Building and Fire Inspector. Additionally, the city's fire inspector met with McCabe; however, the city's fire inspector refused to meet further with McCabe after it had walked off the job and litigation appeared imminent.

Moreover, at a meeting in August 1990, McCabe was told not to put up a building enclosing the generator. Nonetheless, McCabe wanted more money and insisted on putting in explosion-proof controls. McCabe was instructed to proceed with the project without explosion-proof controls around the turbine and then to proceed with the building enclosure. McCabe was further told that the city would agree to indemnify it in the event that there was an explosion due to the failure to use explosion-proof controls around the turbine.

McCabe refused to proceed, however, unless it received more money and a hold-harmless agreement from the city, even for work done in a defective manner. The city rejected McCabe's demands while McCabe kept raising more issues as to why it could not go forward with construction and why it deserved more money to complete the project.

Counsel argued that McCabe's interpretation of the safety code was more stringent than the interpretation of the city, its insurers, the manufacturer, and the engineers. Counsel also represented that under the allowance provisions of the contract, McCabe is entitled to more money only if the city increases the quantity or quality of the building enclosure.

Counsel for the city further represented that under the contract, it is McCabe's responsibility to obtain a building permit for the enclosure. Counsel referred to the provision in the contract that rendered McCabe responsible for all equipment necessary to operate the generator, which included, under the contract's definition of "equipment," the building enclosure. Counsel stated that design drawings for the building had to be submitted in order to obtain the building permit and that McCabe had the responsibility to design the building enclosure and submit and obtain the design drawings. In any event, no matter who had the responsibility for obtaining the building permit, it could not have been done without the design drawings.

Counsel then made the following statement upon which McCabe and Aetna relied when arguing to the court that they were entitled to a directed verdict:

"Indeed the evidence will show that if the city had agreed to pay him more money to put the explosion proof controls here, or to do explosion proof design, if we had agreed to pay him more money he would have to go forward without the State building permit.

"Should there have been state building permit. Yes. There should have been.

"Should the city have made sure that McCabe got one. Yeah. Absolutely.

"Should the city of [sic] made sure that someone got one even if Mr. McCabe thought it was our obligation? Absolutely.

"But did this failure to get a state building permit have anything to do with the issue in this case that was raised for Mr. McCabe's failure to perform? No."

Counsel for the city further stated that McCabe raised other "safety" issues to the city, including that the stack height did not meet EPA requirements, that underground storage tanks were leaking hazardous waste, and that overhead electric wires created a work hazard. The city denied that any of these issues raised by McCabe were valid.

After McCabe left the project, the city spent over a month in meetings with McCabe in an attempt to resolve the issues. The city also waited over five months for Aetna to inform it that Aetna would not pay the performance bond or complete the project, although Aetna knew from day one that it would not. The city stated that Aetna determined not to honor the performance bond before conducting any investigation. The city also spent $30,000 for a site investigation to unsuccessfully convince Aetna to honor the performance bond. The city further stated that the chief investigator at Aetna destroyed documents in his file to cover up the decision not to pay.

Ultimately, the city had to request additional bids and raise additional funds to pay another contractor to finish the job.

Based on the foregoing, Aetna and McCabe sought a directed verdict on the basis that the city's failure to obtain the necessary building permit pursuant to R.C. 3791.04 prevented McCabe from going forward and installing an enclosure around the gas turbine generator. The trial court granted Aetna's and McCabe's motion for a directed verdict, holding that the city's failure to obtain the building permit "renders the construction contract at issue unenforceable due to illegality or unenforceable due to failure to meet a condition precedent to the enforcement of the contract. See *Security Sewage Equipment Co. v. McFerren,* 14 Ohio St.2d 251 [43 O.O.2d 432, 237 N.E.2d 898] (1968)." The lower court then dismissed the city's counterclaim and third-party claim and also dismissed McCabe's contract claim.

We believe the lower court misconstrued the Supreme Court's holding in *Security Sewage Equip. Co. v. McFerren* (1968), 14 Ohio St.2d 251, 43 O.O.2d 432, 237 N.E.2d 898, and erred in directing verdicts in favor of Aetna and McCabe. In *Security Sewage,* the defendants, "the owners and developers of a residential subdivision, entered into a purchase contract with Security for the sale, delivery and installation of a central sewage treatment plant, whereby Security agreed to ' * * * install the entire aforementioned unit and to complete and make it ready for use, and operation by the buyer, at the delivery address above specified * * *.' " *Id.* After Security delivered some of the equipment, the State Department of Health refused to approve the plans for the construction and installation of the facilities as submitted by defendants' engineers. The defendants further admitted they never formed a public utility to operate the plant. Security brought suit, seeking damages for the defendants' failure to obtain approval of their plans by the Department of Health, which, they argued, constituted a breach of the purchase contract. The trial court held that approval of the plans was a condition precedent to enforcement of the contract and dismissed Security's petition as well as defendants' cross-petition. The court of appeals reversed and entered judgment in favor of Security.

The Supreme Court reversed the court of appeals and reinstated the trial court's judgment, noting that "[a]lthough it would appear that the approval of the plans by the Department of Health is a condition precedent to the enforcement of the contract, the cases and authorities do not so hold. The risk of rejection was assumed by the seller [Security], not the purchaser." *Id.*, 14 Ohio St.2d at 253, 43 O.O.2d at 433, 237 N.E.2d at 900. The Supreme Court placed the risk of governmental interference in performance of the contract on the party that contracts to render the performance and restated the general rule:

"Ordinarily, when one contracts to render a performance for which a government license or permit is required, it is his duty to get the license or permit so that he can perform.

"The risk of inability to obtain it is on him; and its refusal by the government is no defense in a suit for breach of his contract." 14 Ohio St.2d at 254, 43 O.O.2d at 433, 237 N.E.2d at 901.

Finally, in its syllabus, the Supreme Court held:

"1. The risk of rejection of the plans for a central sewage treatment plant by the Department of Health pursuant to Section 3701.18, Revised Code, is on the seller of the plant, where the seller agrees to install and make the plant ready for use and operation, and the lack of approval thereof does not constitute a breach of the contract for which the purchaser is liable.

"2. Where one contracts to render a performance for which government approval is required, he assumes the duty of obtaining such and the risk of its refusal is on him."

In the present case, the trial court reviewed the construction contract and R.C. 3791.04 and concluded the contract was illegal and/or unenforceable due to the city's failure to obtain a building permit. R.C. 3791.04 provides, in pertinent part:

"Before entering into a contract for or beginning the construction, erection, or manufacture of any building to which section 3781.06 of the Revised Code is applicable, including all industrialized units, the owner thereof shall, in addition to any other submission of plans or drawings, specifications, and data required by law, submit the plans or drawings, specifications, and data prepared for the construction, erection, and equipment thereof, or the alteration thereof or addition thereto, which plans or drawings, and specifications shall indicate thereon the portions that have been approved pursuant to section 3781.12 of the Revised Code, for which no further approval shall be required, to the municipal, township, or county building department having jurisdiction if such department has been certified as provided in division (E) of section 3781.10 of the Revised Code, and if

there is no certified municipal, township, or county building department, to the chief of the division of workshops and factories, for approval.

" * * *

"No owner or persons having control as an officer, or as a member of a board or committee, or otherwise, of a building to which section 3781.06 of the Revised Code is applicable, and no architect, designer, engineer, builder, contractor, subcontractor, or any officer or employee of a municipal, township, or county building inspection department shall violate this section.

"Whoever violates this section shall be fined not more than five hundred dollars."

In addition, Section 4.3 of the construction contract provides:

*"PERMITS, LICENSES, EXCEPTIONS AND APPROVALS*

"The CONTRACTOR shall be responsible for obtaining all governmental permits, licenses, exemptions and approvals necessary to disassemble, Remanufacture, transport, reassemble, reinsulate with appropriate materials, and install the Equipment at the site in Dover, Ohio. The OWNER shall be responsible for obtaining and/or arranging for all City of Dover permits, the State of Ohio Environmental Protection Agency Permit to Install, sale of electric power, financing arrangements of Contracts and all other matters not directly related to disassembly, Remanufacture, transportation, reassembly and installation of the Equipment. If either Party requests, the other party shall provide reasonable assistance in obtaining any necessary permits, licenses, exemptions or approvals."

In construing the above agreement in light of R.C. 3791.04, this court must keep in mind that courts should prefer a meaning which gives the contract vitality rather than a meaning which renders its performance illegal or impossible. *Kebe v. Nutro Mach. Corp.* (1985), 30 Ohio App.3d 175, 30 OBR 316, 507 N.E.2d 369, paragraph one of the syllabus; *State ex rel. Gordon v. Taylor* (1948), 149 Ohio St. 427, 37 O.O. 112, 79 N.E.2d 127. Moreover, a party to an agreement has the burden to show that it made good faith efforts to satisfy any contractual conditions which allegedly excuse its performance. *Kebe, supra,* paragraph two of the syllabus. When disputed, good faith efforts to satisfy contractual conditions are factual issues. *Id.; John T. Shear Corp. v. Shiros, Inc.* (Oct. 3, 1985), Cuyahoga App. No. 49559, unreported, 1985 WL 8097; *Glickman v. Coakley* (1984), 22 Ohio App.3d 49, 22 OBR 145, 488 N.E.2d 906.

In reviewing counsel's opening statement and the instant contract in a light most favorable to the city, this court concludes that an issue of fact exists with respect to whether McCabe assumed the risk of failing to obtain the necessary building permit for the turbine enclosure. The contract clearly states that "[t]he

Contractor [McCabe] shall be responsible for obtaining all governmental permits, licenses, exemptions and approvals necessary to disassemble, Remanufacture, transport, reassemble, reinsulate with appropriate materials, and install the Equipment at the site in Dover." Moreover, Section 2.2.01 of the contract provides:

"A. The equipment shall be complete and shall include all equipment and auxiliaries necessary to make a complete generating unit. Equipment shall include, but not be limited to the following:

" * * *

"21. Building Enclosure"

On the other hand, the contract provides that the city "shall be responsible for obtaining and/or arranging for all City of Dover permits, the State of Ohio Environmental Protection Agency Permit to Install, sale of electric power, financing arrangements or Contracts, and all other matters not directly related to disassembly, Remanufacture, transportation, reassembly and installation of the Equipment."

Aetna and McCabe argue that the city is responsible for obtaining the necessary building permit under the contract, making the city responsible for "all other matters not directly related to * * * Remanufacture, * * * reassembly and installation of the Equipment."

■ To be sure, the parties are in dispute as to whether a building permit for the enclosure is directly or indirectly related to the reassembly of the enclosure. The parties do not dispute that such permit is not required by the city; rather, counsel's opening statement represented that the State Department of Workshops and Factories is responsible for issuing the necessary permit. Because the building enclosure is specifically included within the contractual definition of "equipment," and a permit is necessary "[b]efore entering into a contract for or beginning the construction, erection or manufacture of any building," we believe obtaining a building permit is directly related to the "reassembl[y]" of the enclosure. Thus, because McCabe contracted to reassemble all equipment, including the building enclosure, McCabe agreed to render a performance for which governmental approval is required, *i.e.*, to reassemble a building enclosure for which a building permit is required. Thus, McCabe assumed the duty of obtaining such building permit and the risk that such permit could be rejected. *Security Sewage, supra.* Moreover, in construing counsel's opening statement, it appears that McCabe failed to make a good faith effort to satisfy its contractual obligations and is, therefore, in breach of the contract. This issue was, therefore, a factual issue for the jury's consideration. *Kebe, supra.*

Of equal importance to this court is that R.C. 3791.04 does not steadfastly require that the owner obtain the permit before entering the contract. Thus, failure to obtain the permit is not a condition precedent to enforcement of the contract. *Security Sewage, supra.* Rather, the statute plainly states that "[b]efore entering into a contract for *or beginning the construction, erection, or manufacture of any building,* * * * the owner shall * * * submit the plans or drawings, specifications, and data prepared thereof * * * to the chief of the division of workshops and factories for approval." Thus, the plain language of the statute provides that plans may be submitted after entering into the contract but clearly before beginning construction. By providing that a building permit shall be applied for "before entering into a contract for or beginning the construction, erection, or manufacture of any building," the General Assembly clearly did not intend to render construction contracts illegal when entered before submitting the plans, drawings, or specifications for the building to be constructed.

Additionally, because R.C. 3791.04 does not create a condition precedent to entering a construction contract, since an application can be submitted before construction, it does not appear that the statute was ever violated, since construction of the building apparently never even commenced (although to have done so without the permit would clearly have subjected both the city and McCabe to a $500 penalty). In this light, it is apparent that an issue of fact exists as to whose responsibility it was to obtain the building permit and whether the responsible party was in breach for failing to obtain the permit. Construing counsel's opening statement and the contract in a light most favorable to the city, it appears McCabe assumed this responsibility. Therefore, the issue should have proceeded to a jury determination.

Other jurisdictions are in accord in holding that failure to obtain a building permit does not preclude enforcement of a construction contract on the grounds of illegality or failure of a condition precedent. See *Meissner v. Caravello* (1954), 4 Ill.App.2d 428, 124 N.E.2d 615, 617–618 (weight of authority holds that failure to obtain building permit does not preclude recovery for work and materials furnished); *Lavine Constr. Co. v. Johnson* (1981), 101 Ill.App.3d 817, 57 Ill.Dec. 389, 428 N.E.2d 1069; *Contractor Indus. v. Zerr* (1976), 241 Pa.Super. 92, 359 A.2d 803, 807 (contract for installation of swimming pool not invalidated by failure to obtain necessary permit wherein court noted that "what is involved here is a collateral illegality that does not affect the enforceability of the contract"); *M. Arthur Gensler, Jr. & Assoc. v. Larry Barrett, Inc.* (1972), 7 Cal.3d 695, 103 Cal.Rptr. 247, 499 P.2d 503 (failure of contractor to obtain pre-contract building permit did not render contract illegal, holding that "the statute making the conduct illegal, in providing for a fine or administrative discipline,

excludes by implication the additional penalty involved in holding the contract unenforceable * . * *"); *Keith Furnace Co. v. Mac Vicar* (1938), 225 Iowa 246, 280 N.W. 496, 498–499 (agreement to install oil burning system into owner's home was valid, untainted with any vice, and defendant cannot avoid payment for system because plaintiff in performing its part of contract violated ordinance); see, also, *Lew Bonn Co. v. Herman* (1965), 271 Minn. 105, 135 N.W.2d 222 ("The failure of an electrical contractor to file with the city building inspector a copy of plans and specifications as required by ordinance did not render the contract illegal where such failure was no more than a slight breach relating to a collateral duty and did not involve bad motives or a design to deny the protection of law to one of a class for whose benefit the ordinance was enacted."); accord *Measday v. Sweazea* (App.1968), 78 N.M. 781, 438 P.2d 525 (court held that plumber's failure to obtain permit required by statute prior to commencement of plumbing work on building did not prevent enforcement by plumber of contract between plumber and building owner); *Comeaux v. Mann* (Tex.App.1951), 244 S.W.2d 274 (although necessary permit to make repairs and improvements on building had not been obtained from city by owner when contract for repair and improvement of building was executed, contract was enforceable and owner was liable in damages for breach thereof).

Moreover, even assuming that the city is responsible for obtaining the building permit if the permit is required by the state of Ohio or is considered some "other matter not directly related to" construction of the building enclosure, the city's assertion that the permit could not be obtained without the necessary plans and specifications for which McCabe was responsible prevents the city from fulfilling its contractual obligations and renders McCabe in breach of the contract. Under Section 4.3 of the contract, McCabe is required to "provide reasonable assistance in obtaining any necessary permits, licenses, exemptions or approvals" if requested by the city.

Both McCabe and Aetna cite various cases in support of their argument that the city's alleged violation of R.C. 3791.04 renders the contract illegal and unenforceable. Both correctly point out that R.C. 3791.04 regulates the construction of buildings and therefore promotes the public health, safety, and welfare. However, as previously stated, R.C. 3791.04 merely requires that the construction plans, drawings, or specifications be submitted for approval "[b]efore entering into a contract for *or beginning the construction, erection, or manufacture of any building.*" (Emphasis added.) We agree with the city that under the plain reading of the statute, the obligation to apply for the permit is in the disjunctive and, therefore, an application for a permit may be made before entering into a contract or before commencing construction of the building. This interpretation does not render the statute meaningless, since the public health, safety, and

welfare remain protected by requiring the application to be submitted before construction of the building. The risk of having the application rejected falls on the party who assumes responsibility under the construction contract. This in no way affects the public health, safety, and welfare.

 We further reject the contention that R.C. 3791.04 creates a "non-delegable" duty on the part of the "owner" to submit the plans, specifications, or drawings necessary for a building permit. Neither McCabe nor Aetna provides this court with any authority to hold that the owner cannot submit such plans through an agent, such as a contractor, and this court declines to so hold. Indeed, counsel for Aetna in argument before this court all but conceded that an agent of the owner may submit plans on behalf of the owner.

 Based on the foregoing, we conclude that the trial court committed prejudicial error in granting directed verdicts in favor of McCabe and Aetna on the city's counterclaim and third-party claim. Adherence to R.C. 3791.04 is not a condition precedent to entering the contract, nor does R.C. 3791.04 render a contract illegal if an application for a building permit is not submitted prior to entering into the contract. Moreover, it does not appear that R.C. 3791.04 was ever violated, since construction of the building enclosure apparently never commenced. In any event, in construing the city's opening statement and the plain language of the contract in a light most favorable to the city, we conclude that an issue of fact remains as to whether McCabe bore the responsibility of complying with R.C. 3791.04 and whether McCabe bore the risk of having any application so submitted rejected.

The city's first and third assignments of error have merit, and this cause is reversed and remanded for further proceedings consistent with this court's opinion on the city's counterclaim and third-party complaint.

## II

### Aetna's Cross–Appeal

In its cross-appeal, Aetna contests the trial court's decision that overruled its motion for summary judgment against the city and the trial court's decision overruling various motions *in limine*.

### A

 In its first assignment of error, Aetna argues that the trial court erred in denying its motion for summary judgment. It is well settled, however, that a trial court's order denying a motion for summary judgment is not a final appealable order. *State ex rel. Overmeyer v. Walinski* (1966), 8 Ohio St.2d 23, 37

O.O.2d 358, 222 N.E.2d 312; *State Farm Mut. Auto. Ins. Co. v. Cincinnati Ins. Co.* (June 17, 1993), Cuyahoga App. No. 62930, unreported, 1993 WL 215450. Thus, the movant is precluded from seeking review of the denial until such time as the court enters a subsequent, adverse, and final judgment on the merits of the claim. *Balson v. Dodds* (1980), 62 Ohio St.2d 287, 289, 16 O.O.3d 329, 330, 405 N.E.2d 293, 295; *Motorists Mut. Ins. Co. v. Cincinnati Ins. Co.* (Sept. 10, 1993), Wood C.P. No. 91 CV 520, unreported, 1993 WL 342587.

In the present case, no final order adverse to Aetna has been entered on the city's third-party complaint for breach of contract and bad faith in handling the city's claim. Moreover, the use of Civ.R. 54(B) language, that there is no just cause for delay, would fail to render the trial court's judgment final, as use of such language "does not turn an otherwise non-final order into a final appealable order." *Celebrezze v. Netzley* (1990), 51 Ohio St.3d 89, 90, 554 N.E.2d 1292, 1293–1294; *Motorists Mut., supra.* We pause to add that on remand, should an adverse judgment be entered against Aetna on the city's third-party complaint for breach of contract and bad faith, then Aetna would be entitled to assign as error the trial court's order denying summary judgment. *Balson, supra; State Farm Mut. Auto. Ins. Co., supra.*

Aetna's first assignment of error is, therefore, dismissed.

### B

In Aetna's fourth assignment of error, Aetna argues the trial court erred in overruling various motions *in limine* filed prior to trial. It is axiomatic that a ruling on a motion *in limine* is a tentative, interlocutory, precautionary ruling by a court in anticipation of its rulings on evidentiary issues at trial. *Collins v. Storer Communications, Inc.* (1989), 65 Ohio App.3d 443, 584 N.E.2d 766; *Bruckner v. Taddie* (Mar. 3, 1994), Cuyahoga App. No. 64567, unreported, at 5, 1994 WL 66455. Because the trial court directed a verdict in favor of Aetna and McCabe, it never had the opportunity to render a final ruling on the evidentiary issues presented in the motions *in limine.* Moreover, because this court has reversed and remanded the city's counterclaim and third-party complaint, these rulings remain interlocutory and nonreviewable.

Accordingly, Aetna's fourth assignment of error is dismissed.

### III

#### *McCabe's Cross–Appeal*

In McCabe's first assignment of error, McCabe requests this court to reinstate its breach of contract claim against the city in the event that this court rules in favor of the city on its appeal. The city does not oppose McCabe's assignment of

error. We agree that McCabe's claim for breach of contract should be reinstated. Accordingly, McCabe's first assignment of error is sustained, and McCabe's breach of contract claim is ordered reinstated. App.R. 16(B).

In McCabe's second assignment of error, McCabe incorporates by reference Aetna's assignments of error and arguments in support thereof. Although the trial court has entered an adverse judgment against McCabe dismissing its claim for breach of contract, this court's disposition of McCabe's first assignment of error renders its second assignment of error moot. Therefore, we decline to address the merits of this assignment of error. App.R. 12(A)(1)(c).

### Conclusion

The judgment of the trial court is reversed, and the cause is remanded on the city's cross-complaint and third-party complaint and on McCabe's complaint for breach of contract.

*Judgment accordingly.*

NAHRA, C.J., and PARRINO, J., concur.

THOMAS J. PARRINO, J., retired, of the Eighth Appellate District, sitting by assignment.