2002 SD 80

**NATURE'S 10 JEWELERS, A Sam Savage Company, Inc., and Sam Savage, Individually, Plaintiffs and Appellants,**

v.

**Brian GUNDERSON, Defendant and Appellee,**

and

**Nature's 10, Inc., a South Dakota Corporation; Mylan Ventures, Ltd., a North Dakota Corporation; Frank Barnes; Jerry Haack; and Barney Schumacher, Defendants.**

No. 21962.

Supreme Court of South Dakota.

Argued Jan. 10, 2002.

Reassigned on March 01, 2002.

Decided July 10, 2002.

Rehearing Denied Aug. 13, 2002.

Ronald A. Parsons, Jr., Steven M. Johnson of Johnson, Heidepriem, Miner, Marlow and Janklow, Sioux Falls, South Dakota and Matthew McCaulley of Hynes & McCaulley, LLC, Sioux Falls, South Dakota, Attorneys for plaintiffs. and appellants.

Tina M. Hodne of Berenstein, Moore, Berenstein, Heffernan & Moeller, LLP, Sioux City, Iowa, Attorneys for defendant Brian Gunderson.

GORS, Acting Justice (on reassignment).

[¶ 1.] Sam Savage (Savage) and Rossi Fine Jewelers (Rossi) each separately sued Nature's 10, Inc. (Nature's 10), and various directors and officers. In both cases, the

trial court ruled that federal law and the contracts between the parties mandated arbitration in both cases. We hold that the contract between Savage and Nature's 10 is void, and therefore compulsory arbitration is not required. We reverse. (In a separate decision, we decide that the same arbitration clause in the contract between Rossi and Nature's 10 is valid and requires compulsory arbitration.)

## FACTS

[¶ 2.] Defendant Nature's 10 was incorporated in South Dakota in 1995. In 1996, defendant Mylan Ventures, Ltd., (Mylan) a Wyoming corporation, purchased Nature's 10. The remaining defendants, Mike Alvano, Frank Barnes, Kirk Gardner, Brian Gunderson, Jerry Haack, Barney Schumacher and Randy Slaybaugh were either directors or officers of Nature's 10 or Mylan during the time of the transactions described here. Some of the individual defendants appeared in circuit court, yet only Brian Gunderson responded to the plaintiff's appeal.

[¶ 3.] Nature's 10 held itself out as a franchiser offering potential franchisees an opportunity to participate in retail sales of various articles of jewelry at discounted prices. Nature's 10 stores were advertised as marketing diamonds obtained from Nature's 10's own mines, cut in its own facilities and offered at lower prices to franchisers. Nature's 10 was registered to sell franchises with the South Dakota Division of Securities.

[¶ 4.] On August 27, 1997, the South Dakota Division of Securities notified the defendants that the Nature's 10 franchise registration had expired. Then on October 1, 1997, the Division withdrew the company's registration number effective July 29, 1997. Defendants were warned that the company "will no longer be engaged in the offer or sale of franchises in South Dakota."

[¶ 5.] Plaintiff Sam Savage (Savage), a Florida resident, had previously been in the jewelry business and was interested in operating a jewelry franchise store. Savage negotiated with Nature's 10 and signed a franchise agreement with the company on December 19, 1997—more than four months after Nature's 10 was no longer authorized to sell franchises.[1] After signing the franchise agreement, Savage made additional, substantial investments and opened his Nature's 10 franchise store in Naples, Florida in April of 1998. On May 14, 1998, Nature's 10 was formally dissolved as a corporation by the South Dakota Secretary of State. Savage closed his store in January of 1999 after losing several hundred thousand dollars.

[¶ 6.] Nature's 10 offered "manufacturer-direct purchasing" with "a continuous supply of discounted wholesale diamonds from the company's own mines" cut in their own facilities. Nature's 10 promised the following to Savage:

- Nature's 10 would allow Savage to provide diamonds to insurance companies that were replacing jewelry lost by or stolen from their insureds.
- Nature's 10 would provide Savage initial training in the operation of a franchise.
- Nature's 10 would develop and administer a corporate awards program.
- Savage would receive company-administered updates and maintenance for a computerized inventory catalog of jewelry designs.
- Nature's 10 would establish a toll free telephone service number to provide information and assistance.

---

1. By contrast, Rossi signed a franchise agreement with Nature's 10 on April 10, 1997, while Nature's 10 was still authorized to sell franchises.

- Nature's 10 would provide training for bookkeeping, accounting, inventory control and other procedures for the operation of a franchise.

[¶ 7.] Nature's 10 had no diamond mines, no cutting facilities and no diamonds. There was no insurance jewelry replacement program, no coordinated advertising and strategies, no franchise training, no corporate awards program, no computerized inventory catalog of jewelry designs, no toll free service number, no training and support for bookkeeping, accounting, inventory control and other procedures. Nature's 10 provided none of the guaranteed franchise products and services. In short, the things that Nature's 10 promoted did not exist and the things that Nature's 10 promised were not provided. Savage was forced to close his business at a substantial loss.

[¶ 8.] In his lawsuit, Savage alleged breach of contract, failure of consideration, breach of implied duty of good faith and fair dealing, actual fraud, constructive fraud, deceit, misrepresentation in the sale of a franchise, piercing the corporate veil to impose personal liability on the directors and officers, and three additional counts alleging specific franchise statute violations. Rossi filed a similar lawsuit. On October 6, 2001, Savage and Rossi moved to consolidate their actions. The parties then stipulated that the actions would be consolidated for discovery purposes. Defendants moved for compulsory arbitration in accordance with a clause in the franchise agreements. Although Savage opposed the motion, the trial court entered an order requiring arbitration. Savage appeals.

[¶ 9.] The franchise agreement between Nature's 10 and Savage contained the following arbitration clause:

Any monetary claim arising out of or relating to this Agreement, or any breach thereof ... shall be submitted to arbitration in [Union] County, South Dakota, in accordance with the rules of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof and shall be final, binding and unappealable.... [2]

The trial court held that this provision and federal law required compulsory arbitration.

## STANDARD OF REVIEW

[¶ 10.] Written contracts are reviewed without any presumption in favor of the trial court's interpretation. *Thunderstik Lodge, Inc. v. Reuer*, 1998 SD 110, ¶ 12, 585 N.W.2d 819, 822. Contract interpretation is a question of law. *Id.*

## ANALYSIS AND DECISION

[¶ 11.] This Court has consistently favored the resolution of disputes by arbitration, *Thunderstik Lodge* at ¶ 14, as we have done in *Rossi v. Nature's 10*, 2002 SD 82, ¶ 14, 648 N.W.2d 812, which is the companion to this case. The purpose of arbitrating disputes is to provide a relatively quick and inexpensive resolution without the cost and delay that may come with legal proceedings. *Rossi* at ¶ 8; *Thunderstik Lodge* at ¶ 14. There is an overriding policy favoring arbitration when a contract provides for it. *Id.* In addition, South Dakota has adopted the Uniform Arbitration Act. SDCL 21–25A–1 provides:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon

---

2. The document actually mentions "Woodbury County, South Dakota," but the trial court found that "Union County, South Dakota," was intended.

such grounds as exist at law or in equity for the revocation of any contract.

If there is doubt whether a case should be resolved by traditional judicial means or by arbitration, arbitration will prevail. *Thunderstik Lodge*, 1998 SD 110 at ¶ 15, 585 N.W.2d at 822 (citing *City of Hot Springs v. Gunderson's, Inc.*, 322 N.W.2d 8, 10 (S.D.1982)).

[¶ 12.] However, in this case, there was no valid contract. The franchise agreement, which was entered into between Savage and Nature's 10 several months after the franchise registration expired, was void, not voidable. A void contract is invalid or unlawful from its inception. It is a "mere nullity, and incapable of confirmation or ratification." Black's Law Dictionary at 1573 (6th ed.1990). A voidable contract, on the other hand, is a valid contract that can be "legally voided at the option of one of the parties." *Id.* at 1574. Here, the franchise agreement between Savage and Nature's 10 was signed in violation of SDCL 37–5A–6. This statute provides that "[n]o person may offer or sell any franchise ... unless there is an effective registration statement on file...." Because there was no effective registration statement on file, the agreement between Nature's 10 and Savage was unlawful from its inception. SDCL 53–9–1. An unlawful contract is void. SDCL 53–5–3 and 20–2–2; *Green v. Mt. Diablo Hosp. Dist.*, 207 Cal.App.3d 63, 254 Cal. Rptr. 689, 697 (1989) (stating "illegality serves to void the entire contract").

[¶ 13.] While there may be a policy favoring arbitration when a contract provides for it, you cannot arbitrate a felony.

In *Party Yards, Inc. v. Templeton*, the Fifth District Florida Court of Appeals said: "A claim that a contract is illegal and, as in this case, criminal in nature, is not a matter which can be determined by an arbitrator. An arbitrator cannot order a party to perform an illegal act." 751 So.2d 121, 123 (Fla.Dist.Ct.App.2000). In this case, the defendants contracted with Savage in violation of state law. None of the promises were fulfilled. The corporation evaporated. This Court will not permit the individuals who committed the illegal acts on behalf of the corporation to benefit from the arbitration clause in the illegal contract.

[¶ 14.] GILBERTSON, Chief Justice, and AMUNDSON, Justice, concur.

[¶ 15.] SABERS and KONENKAMP, Justices, dissent.

[¶ 16.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

KONENKAMP, Justice (dissenting).

**A.**

[¶ 17.] Few rules are more settled than the one that requires appellate judges to limit themselves to reviewing issues the parties preserved below and raised on appeal. Here, the Court departs from that reliable process by raising its own challenge to the trial court's decision. In doing so, the majority makes findings of fact and considers a question not broached in the trial court and not brought to us for decision.[3] Moreover, to reverse the trial

---

**3.** Although the trial court entered no findings of fact on the legitimacy of the defendants' franchise offering, the majority registers a litany of fact findings on this issue. In effect, the Court assumes that all plaintiffs' assertions are true. On appeal, plaintiffs submitted the following single issue: "Did the circuit court err in holding that defendants could enforce an arbitration clause, despite a waiver of arbitration rights, related to claims and defendants not implicated by a franchise agreement between the plaintiff and one of the defendants?" The briefs do not even mention the possibility, let alone argue, that the agreement was void or voidable.

court in this case, the majority raises an affirmative defense on plaintiffs' behalf. A claim that a contract is void or voidable is an affirmative defense that must be pleaded and proved by the party seeking to avoid the contract. *Fees v. Mutual Fire and Auto. Ins. Co.*, 490 N.W.2d 55, 58 (Iowa 1992).[4] *See also American Property Services v. Barringer*, 256 N.W.2d 887, 890 (S.D.1977).

[¶ 18.] The notion that appeals courts should address only the questions presented to them has a long and stable lineage. Indeed, the spirit of the appellate function abides within the bounds of the controversy under review, leaving for legislators and executives the broader questions the constitution empowers them to pursue. We should rarely "venture opinions regarding issues that have never been briefed, argued, or even adverted to in the course of the proceedings." *Seal–Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 852 (Fed.Cir.1999) (Bryson & Newman, JJ., concurring). Certainly, we have held on occasion that a trial court may be *affirmed* on any theory, even one not raised. But it is unusual for an appellate court to conceive new arguments raised by neither side to justify *reversing* a trial court.[5]

[¶ 19.] It is not, of course, an inflexible rule that an appellate court will never consider issues not argued at trial.

There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.

Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.... [Various] decisions ..., while recognizing the desirability and existence of a general practice under which appellate courts confine themselves to the issues raised below, nevertheless do not lose sight of the fact that such appellate practice should not be applied where the obvious result would be a plain miscarriage of justice.

---

**4.** Until today, affirmative defenses have been considered waived unless the asserting party has affirmatively pleaded and proved them at trial. SDCL 15–6–8(c); *Kier v. Kier*, 454 N.W.2d 544, 546 (S.D.1990); *Oesterling v. Oesterling*, 354 N.W.2d 735, 736 (S.D.1984). Many cases have held that voidness, illegality, and invalidity of a contract are affirmative defenses. *McCabe/Marra Co. v. Dover*, 100 Ohio App.3d 139, 652 N.E.2d 236 (1995) (illegality or invalidity of a contract is an affirmative defense that must be pleaded and proved by the party seeking to avoid the contract); *Rice v. James*, 844 S.W.2d 64 (Mo.Ct.App. 1992) (illegality of a contract is an affirmative defense that must be pleaded and proved by the party seeking to avoid the contract); *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4

(Tex.App.1988) (illegality of a contract is a defensive issue to be pleaded and proved by the defendant in a suit over breach of contract).

**5.** Although plaintiffs' brief twice mentions the fact that the agreement was signed after South Dakota had withdrawn permission for Nature's 10 to offer franchises, such passing references do not suffice to bring the issue before this Court. The issue must be presented, considered, and decided in the trial court. *Cavic v. Pioneer Astro Indus., Inc.*, 825 F.2d 1421, 1425 (10thCir.1987) (citation omitted). In our case, the trial court made no mention of this issue and understandably so because the issue was never broached.

*Hormel v. Helvering*, 312 U.S. 552, 557–58, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037, 1041 (1941).

[¶ 20.] In this commercial dispute between business parties, what fundamental injustice will occur if they are required to proceed to arbitration? And even if one were to concede that this is truly an exceptional case, requiring appellate court intercession, then, at the very least, in the interest of basic due process and simple fairness, we should give the adversely affected party here an opportunity to respond, or we should remand this new question to the trial court for further consideration.

[¶ 21.] In our system of justice, litigants are entitled to notice that an issue is under consideration and to an opportunity to present evidence and argument. Unfortunately, the majority seems to see no need of any further contribution from the actual parties to this controversy. So much for the rule that if there is any doubt whether a case should be resolved by traditional judicial means or by arbitration, arbitration will prevail. *Thunderstik Lodge, Inc. v. Reuer*, 1998 SD 110, ¶ 14, 585 N.W.2d 819, 822 (citing *Tjeerdsma v. Global Steel Bldgs., Inc.*, 466 N.W.2d 643, 645 (S.D.1991); *City of Hot Springs v. Gunderson's, Inc.*, 322 N.W.2d 8, 10 (S.D. 1982)). And so much, too, for the proposition that failure to raise an issue at trial is considered a waiver.

### B.

[¶ 22.] If the claim had been properly raised that the franchise agreement is void, then there is an established procedure in federal precedent for dealing with that question. It is uncontested that the Federal Arbitration Act (FAA) is the controlling law.[6] In *Prima Paint Corpora-*

*tion v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Southland Corporation v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), the United States Supreme Court handed down definitive interpretations of the FAA. In *Prima Paint*, the Court held that a claim of fraud in the inducement of a contract "is for the arbitrators and not for the courts." 388 U.S. at 400, 87 S.Ct. at 1804, 18 L.Ed.2d at 1275. In *Southland*, it declared that any state law that undercuts the enforceability of arbitration agreements violates the Supremacy Clause of the United States Constitution. 465 U.S. at 16, 104 S.Ct. at 861, 79 L.Ed.2d at 15–16.

[¶ 23.] With *Prima Paint* and *Southland* in mind, we can now consider relevant state laws. SDCL 53–9–1 provides:

> A contract provision contrary to an express provision of law or to the policy of express law, though not expressly prohibited or otherwise contrary to good morals, is unlawful.

Furthermore, SDCL 37–5A–6 provides:

> No person may offer or sell any franchise in this state unless there is an effective registration statement on file in accordance with the provisions of this chapter or unless the franchise or transaction is exempted under §§ 37–5A–11 to 37–5A–14, inclusive.

It is uncontested that the franchise agreement here was completed and memorialized by a document signed by both parties only after the State of South Dakota had withdrawn the registration of Nature's 10 as a franchisor.

[¶ 24.] A contract is void *ab initio* "if it seriously offends law or public policy in contrast to a contract which is merely

---

6. Because the franchise agreement was between South Dakota parties and out-of-state parties, the agreement affected interstate commerce and the FAA governs. 9 USC §§ 1–14.

voidable at the election of one of the parties." Black's Law Dictionary 1574 (6th ed.1990). Although the "franchise" agreement was signed in violation of SDCL 37–5A–6 and is therefore "unlawful" according to SDCL 53–9–1, neither party has shown that it "seriously offends law or public policy" or has sought to have it declared void.

[¶ 25.] In *Scanlon v. P & J Enterprises,* the Michigan Court of Appeals had occasion to consider a similar question.[7] 182 Mich.App. 347, 451 N.W.2d 616, 617 (1990). In that case,

> [a]ppellees sued appellants claiming that appellants had violated the Michigan Franchise Investment Law ... in connection with selling appellees their "Fantastic Sam's" beauty parlor franchises. Appellees also alleged various common-law claims for breach of contract, fraud, negligence and tortious interference with a business relationship. Appellees sought rescission of the franchise agreements and monetary damages.

*Id.* In following the decision in *Prima Paint,* the *Scanlon* court concluded that "the federal courts have uniformly held that even a claim of fraud in the inducement of an entire contract containing an arbitration clause is to be referred to arbitration under the [FAA]." 451 NW2d at 618. Furthermore, the Florida Supreme Court, in *Seifert v. U.S. Home Corp.,* noted that

> the phrase "arising out of or relating to" the contract has been interpreted broadly to encompass virtually all disputes between the contracting parties, including related tort claims. *See Southland Corp. v. Keating,* 465 U.S. 1, 15 n. 7, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (involving claims for fraud, misrepresentation,

breach of contract, breach of fiduciary duty, and violation of state franchise investment law); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 406, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that contractual language "[a]ny controversy or claims arising out of or relating to this Agreement, or breach thereof" is "easily broad enough to encompass" claim for fraud in inducement of contract). The addition of the phrase "relating to" to the phrases "arising out of" or "under," has been construed as broadening the scope of the arbitration provision. *See American Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 93 (4thCir.1996) (characterizing phrase "arise out of or related to" as broad arbitration clause "capable of an expansive reach").

750 So.2d 633, 637 (Fla.1999). All the claims advanced by plaintiffs fall under these principles.

[¶ 26.] To complete the analysis, we must turn to the distinction between "void" and "voidable" contracts. This distinction is relevant because the FAA requires that a court be "satisfied the making of the agreement for arbitration ... is not in issue." 9 USC § 4. If the making of the agreement to arbitrate is placed in issue, the court must set the issue for trial. *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.,* 263 F.3d 26, 30 (2ndCir.2001). However, the party putting the arbitration agreement into issue must present "some evidence" in support of its claim before a trial is warranted. *Id.* (citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673, 676 (2ndCir.1972)).

While the teachings of *Interocean* and *Prima Paint* may appear conflicting,

---

7. The language of the arbitration clause under consideration in *Scanlon* was essentially the same as the one here.

they can be sensibly harmonized by understanding that their outcomes implicitly—if not explicitly—rely on the distinction between void and voidable contracts, a distinction already recognized in at least two other circuits.

*Id.* at 31. The *Sphere Drake* court then points out that *Interocean* provides a good example of a void contract, *Prima Paint* of a voidable contract. *Id.*

> Under *Interocean,* a party alleging that a contract is void—and providing some evidence in support—is entitled to a trial on the contract's arbitrability.... And, under *Prima Paint,* a party is not entitled to a trial on the arbitrability of a voidable contract unless the party alleges that the arbitration clause itself is voidable and provides some evidence in support of its allegation.

*Id.* at 31–32. The *Sphere Drake* court concludes the discussion as follows:

> If a party alleges that a contract is void and provides some evidence in support, then the party need not specifically allege that the arbitration clause in that contract is void, and the party is entitled to a trial on the arbitrability issue pursuant to 9 USCA § 4 and the rule of *Interocean.* However, under the rule of *Prima Paint,* if a party merely alleges that a contract is voidable, then, for the party to receive a trial on the validity of the arbitration clause, the party must specifically allege that the arbitration clause is itself voidable. Accordingly, to defeat the arbitration clauses in the contracts at issue, Sphere Drake must allege that the contracts as a whole are void or that the arbitration clauses in the contracts are voidable. Of course, it is not enough for Sphere Drake to make allegations—Sphere Drake must also produce some evidence substantiating its claim. *See Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4, 7 (2ndCir.1981) (per curiam).

*Id.* at 32. In our case, plaintiffs never even argued—much less produced evidence to show—that the contract is void. Nor have they argued that the arbitration clause itself is voidable. Under these circumstances, we should presume that the arbitration portion of the contract between the parties is enforceable.

[¶ 27.] Our concern should not end at this point, however. Although it is an incorrect supposition that arbitration results in an inadequate remedy for parties who do not wish to arbitrate, we should look for assurance that adequate remedies are available through arbitration. As the Eleventh Circuit wrote in a similar case on choice-of-forum clauses, we will declare an arbitration clause unenforceable "when the remedies available in [that forum] are so inadequate that enforcement would be fundamentally unfair." *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1297 (11thCir.1998). Here, plaintiffs have produced no evidence to show that the remedies available to them under arbitration are inadequate or fundamentally unfair.

[¶ 28.] We should affirm the trial court's ruling that this case be submitted to compulsory arbitration.

[¶ 29.] SABERS, Justice, joins this dissent.