DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, ("Austin") appeal a jury verdict from the Medina County Court of Common Pleas, which found for Appellees ("Kluczarov") on the issues of fraud and breach of an oral contract. We affirm.
 I. {¶ 2} This case arises from construction work done on Austin's real properties by Kluczarov. The parties worked together well for a time; however, eventually they fell out and Austin fired Kluczarov. Kluczarov filed a lien on Austin's real properties in Hinckley and on Foskett Road in Brunswick Hills Twp. After the liens attached, Austin filed suit against Kluczarov alleging slander of title regarding the Foskett Road property, breach of contract claims regarding the sale of a GMC Suburban and snow plow, and failure to perform excavating services correctly on the Hinckley and the Foskett Road property. Kluczarov counterclaimed, alleging Austin owed money damages plus interest for work performed and materials provided at both properties, and for breach of the parties' oral contract. Austin filed a motion for summary judgment, which the trial court denied. The matter was tried to a jury which found for Kluczarov and against Austin on all counts. Austin timely appealed raising four assignments of error. We begin with the second assignment of error to facilitate review.
 II. Assignment of Error No. 2
"The trial court erred by overruling the objection of appellant's counsel when racist remarks were made by appellees' counsel in front of the jury."
 {¶ 3} In this assignment of error, Austin claims that Kluczarov, his witnesses, and his legal counsel "repeatedly made mention of [Austin's] Arabic heritage" which the trial court failed "to remedy[.]" Austin points to six different sections of testimony to support his argument. The first claimed offense occurs in the transcript at page 531:
"Q. Did Robert ever talk about his experience in training in the time and his skills in any particular field during the time that you worked for him?
"A. I worked for the gentleman for a year and a half, there about two years possibly. This man would have to be a few hundred years old for all the things that he claimed that he had done. And it was incredible, working for the CIA, he worked in Saudi Arabia, excuse me. But there was so much bullshit."
 {¶ 4} There is no objection to this testimony in the record. The next claimed offense occurs in the transcript on page 532:
"A. Sorry sir. Hard to believe everything that he experienced. He is a couple years younger than I am but no one has done everything that he has done at his age.
"Q. You said that he talked about the Middle East and the people that he knew in the Middle East?
"A. Yes, sir.
"Q. Who were some of the people that he said that he knew in the Middle East.?
"A. Prince Fozzle (sic) Saudi Arabia was a good friend of his.
"Q. Anybody else?
"A. He mentioned some other names, but after listening to it, I dismissed the most of it as —
"Q. Anybody else?
"Mr. Pelagalli: Objection, Your Honor.
"The Court: Oh, that's fine.
"Q. Okay: Did he talk about his training as an engineer at any point in time?
"A. He mentioned some underground work in Saudi Arabia, some company, again, it's been years ago, I can't recall."
 {¶ 5} The next offense complained of occurs at pages 694-695:
"Q. Did he talk around you about some of the people, famous people that he knew in the world?
"A. Yes.
"Mr. Pelagalli: Objection.
"The court: Overruled.
"Q. What were some of the famous people that he said that he knew?
"A. There was like a couple kings that he knew, some sultans, one time he mentioned something about Saddam Hussein or Hussein's only doing like —
"Q. What happened when he mentioned Saddam Hussein?
"A. He was saying something, he said he was not such a bad guy.
"Mr. Pelagalli: Objection, Your Honor.
"The Court: [Mr.] Abakumov, what was that for? What was that for? It's not right. Disregard Ladies and Gentlemen of the Jury. This isn't about anybody's political views of anything or trying to blacken the image of anybody. Understand? Mr. Abakumov, I give you a wide latitude, you took advantage of it, advantage of me. That won't happen again.
"Mr. Abakumov: Yes, Your Honor."
 {¶ 6} Next, Austin refers to testimony regarding his name change from Saadi Ahmed:
 {¶ 7} "A. I started as the person that took care of Laura Uthoff[`s] father, Gilbert and the gentleman was elderly, in his 90[']s, bedridden and I would spend four or five hours a day turning him over, took care of his health needs and essentially that's when I first met * * * Saadi Ahmed.
"Q. Saadi Ahmed?
"A. Robert Austin.
"Q. Now. How long ago did you meet Robert Austin, formerly Saadi Ahmed?"
 {¶ 8} There is no objection to this testimony in the record. The next testimony complained of occurs at page 553:
"Q. How did he determine how many brick[s] that he needs, Mr. Austin?
"A. Mr. Austin proposed to us that architect, that he is an engineer, he had told us that he was a fighter pilot for the Arabian Air Force. He also told us that he had a large gun collection, among other things.
"Mr. Pelagalli: Objection, Your Honor, not responsive.
"Q. How did you calculate the brick that you told us about?
"The Court: Stop. Your next question, please."
 {¶ 9} Lastly, Austin refers to testimony at page 577:
"Q. When you were out there with Ed Millican, what was the tone of that discussion?
"A. It was very, almost intimidating. Mr. Austin was very upset about the brick, he came out cross and very upset. He said that the brick was junk, he was going to have, that you should fire the supervisors, get rid of all your workers, make mistakes like that in Kuwait, you could have your throat slit.
"Mr. Boyko: Objection.
"The Court: Basis for your objection is what, sir?
"Mr. Boyko: Prejudicial value of all stuff that's coming out far outways (sic) any probative value.
"The Court: Overruled.
"Q. Mr. Austin made that last comment?
"A. Yes.
"Q. What did you do at that point?
"A. Well, at that point, Ed Millican became very uncomfortable and Ed felt intimidated and I felt the thing to do was to get my bosses there and the president of Bowerston Shale and arrange another meeting. That there was no sense, once that tone was coming out, that there was no sense in proceeding with that meeting at that time."
 {¶ 10} In his appellate brief, Austin also claims as error Kluczarov's references to race in closing arguments, specifically:
"I'll raise the racist comments first. I didn't view these comments as racist and I don't think anyone else should either. The reason they were brought up was because I wanted the jury to see the type of man that Mr. Austin is and I think the type of man that he is the source of these problems. It's not because he has any ethnic argument but because he is a boastful man with a big ego, a man who wants to take control of the job when in fact, he did take control of the [job], who meddled at every step of the way."
 {¶ 11} This remark in closing arguments was in response to a comment Austin made just previously in his closing: "They attempted to dirty up Robert Austin, attempted to dirty up Robert Austin with racist comments. Don't ever let them get away with it."
 {¶ 12} We begin by noting that although Austin finds error in six different sections of witness testimony, he did not enter an objection to the testimony referencing Austin's name change or Austin's alleged employment in the CIA and in Saudi Arabia. Additionally, whereas Austin objected to the testimony that Austin said he was a fighter pilot for the Arabian Air Force, his objection was that the testimony was non-responsive. "[A]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."State v. Williams (1977), 51 Ohio St.2d 112, 117. If a litigant fails to raise directly an issue in the trial court, the litigant waives his or her right to raise the issue on appeal. State v.Awan (1986), 22 Ohio St.3d 120, 123. Therefore, this court will not address those three areas of testimony.
 {¶ 13} Next we note that an objection was raised to the testimony stating that Austin thought Saddam Hussein "was not such a bad guy." The trial court sustained the objection, adamantly expressing displeasure with the line of questioning and the answer, and admonishing the jury to disregard the statement. Regardless, Austin maintains that the jury verdict regarding the amount owed on the Suburban is proof that the jury was inflamed by prejudice; however, we discuss in Assignment of Error No. 1 that the evidence could have been construed for Kluczarov on this issue. Furthermore, it is presumed that a jury will obey the trial court's instructions. State v. Dunkins (1983),10 Ohio App.3d 72, paragraph 2 of the syllabus. Having no reason to believe that the jury would not accept the court's admonition, we find neither error nor prejudice in the trial court's action.
 {¶ 14} Regarding the testimony that Austin knew people in the Middle East including a Saudi prince, Austin objected and the court cryptically ruled, "Oh, that's fine." The line of questioning regarding famous acquaintances was dropped at that point, and the questioning continued regarding Austin's claims that he is an engineer. Reviewing the testimony in context, we believe it was part of a line of questioning intended to cast doubt upon Austin's credibility, which is a relevant issue where fraud is alleged and where Austin was a testifying witness. Furthermore, the line of questioning was abandoned at the objection and so the result is as if the trial court sustained the objection. We see no underlying intent "to improperly raise passion and prejudice regarding the Arabic heritage of Robert Austin" and, since the questioning ended upon objection, any error is harmless.
 {¶ 15} Austin also objected when a witness testified to being intimidated by Austin when meeting him with to discuss problems with the brick used on the house, wherein the witness claimed that Austin referenced slit throats in Kuwait. The objection was based upon prejudice outweighing probative value. Evidence, even though relevant, is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403. The witness testified that he felt intimidated by Austin and why; a good portion of this case involved witnesses testifying to how difficult it was to work with and please Austin, and how Austin ran up costs with his demands. We find that the trial court did not abuse its discretion in allowing the testimony.
 {¶ 16} Lastly, remarks made in closing statements were in response to statements regarding race offered by Austin. Because Austin raised the issue, he cannot quarrel with Kluczarov's rebuttal. Furthermore, Austin testified on direct examination about his training and work in the Middle East, including Kuwait. Given the testimony from both sides and the purposes for it, we cannot find that the trial court abused its discretion.
 {¶ 17} This assignment of error is overruled.
 Assignment of Error No. 1
"The trial court erred in denying appellants (sic) motion for judgment notwistanding (sic) the verdict and/or motion for new trial where jury was prejudiced by racist remarks as evidenced by the verdict on matters which had been admitted by the appellees."
 {¶ 18} Austin argues that the trial court, pursuant to Civ.R. 50(B) and Civ.R. 59(A), should have granted him a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial because the trial transcript shows that: (a) Kluczarov admitted owing at least $4,325.00 to Austin for a Chevrolet Suburban and the jury did not award that money to Austin; (b) there was no evidence of fraud, yet the jury awarded punitive damages and attorney fees to Kluczarov based upon fraud; and, (c) the jury verdict was predicated upon anti-Arab racist sentiments "repeatedly reinforced by the Appellees, over objection." The trial court denied the motion stating:
"Twenty-one witnesses were called. Hundreds of pages of exhibits were placed before the jury for their consideration. Both parties agreed there was an oral contract of some nature and that some work was provided under that contract but the parties wholly disagreed as to any other aspect of this case. There was sufficient evidence for either party to recover on all their claims, depending upon the jury's view of the evidence and the credibility of the witnesses. * * * The court finds that there is substantial competent evidence to support the party against whom the motion is made and reasonable minds might reach different conclusions as to the evidence."
 {¶ 19} Specifically addressing the charge of racist sentiment swaying the jury, the trial court stated:
"Plaintiff seeks a new trial on the ground that the jury awarded inadequate damages to the Plaintiff (in this case inadequate means nothing) because the passion and prejudice of the jury was inflamed by the conduct of the Defendant and his counsel referencing the Plaintiff's Arabic heritage. This court addresses this claim with utmost seriousness. * * * This court does not permit disrespect toward any counsel or toward any party. Bias, whether by race, gender or religion can never be tolerated and, * * * must be immediately and directly confronted. * * * This court was vigilant throughout the trial to assure that the case would be decided on its merits and not based upon heritage of the respective parties. In considering plaintiff's motion for a new trial, the court believes that the verdict of the jury was based upon their careful and calculated determination as to the weight of the evidence and not upon any perceived bias."
 {¶ 20} Pursuant to Civ.R. 50(B), this Court reviews Appellants' motion for judgment notwithstanding the verdict de novo. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257;Reitz v. Akron Aerie No. 555 Fraternal Order of Eagles,Inc.(Nov. 7, 2001), 9th dist. No. 20454 at 5. In ruling on a motion for judgment notwithstanding the verdict, the evidence is construed most strongly in favor of the nonmovant, who is also given the benefit of all reasonable inferences from the evidence.Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68; see, also, Buehler v. Falor (Jan. 30, 2002), 9th Dist. No. 20673, at 6. The Court must not weigh the evidence or the credibility of the witnesses when reviewing such a motion. Oslerv. Lorain (1986), 28 Ohio St.3d 345, syllabus. A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim.Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, 275.
 {¶ 21} We begin our discussion by reviewing Austin's testimony regarding money owed on the Suburban and snow plow. On direct examination, Austin's testimony centered upon Exhibit 21, a typed document dated March 2, 1998. The document is labeled "INVOICE" and has Austin's name, address, and telephone number in the upper left hand corner. There are two columns on the document, one labeled "DESCRIPTIONS" and the other labeled "AMOUNT". Under the description column are listed a "1994 GMC suburban very good condition", a Motorola car phone and its accessories, and a 1997 Meyer snow plow. These items have dollar amounts next to them in the amounts column, and the document shows the amounts to subtotal $21,750. Beneath the subtotal is listed "Trade 1985 Chev. diesel truck for Keith" and next to it, in the amount column, is a deduction for $5,000. Beneath the listing for the diesel truck, is the line "Total due no later than December 1998" and the corresponding entry in the amount column shows $16,750. At the bottom of the document, written by hand in red pencil, is the line "Paid in Dec. 23, 97" with "8000.00" entered in the amount column. Further written in red is a final summation of "8750.00" in the amount column. Neither Kluczarov's name or signature appear anywhere on this document nor any language purporting that this document is an accounting of a debt owed by Kluczarov.
 {¶ 22} The transcript demonstrates the following testimony from Austin regarding the Suburban and snow plow:
"Q. * * * [D]id you and [Kluczarov] work who (sic) out a formal deal for the purchase of a '94 Suburban?
"A. Yes.
"Q. Who set the price for that?
"A. Well, he asked me a price, I told him, I don't know look in the blue book and so we reach, what we had, one of them dealers I deal with and one dealer that he deals with and the price came within $250 from what we sold him.
"Q. Handing what is marked as Exhibit 21, do you recognize that document, sir?
"A. Yes.
"Q. Did you create that document?
"A. Yes.
"Q. What does that document information, what do you glean from that document?
"A. It's $8,000 GMC, '94 Suburban and $750 was for a hands-free phone system in the vehicle. Same, I had a '97 Chevy dump truck and we had a plow on it for work for the farm and I sold him a plow because we have too many tractors on the farm. So subtotal was $21,000. We have Keith Mifflin.
"* * *
"Q. Robert, let's talk about that just a minute, how do you know him. Was he doing the lake on the job for [Kluczarov]?
"A. Yes.
"Q. Does his name appear on the receipt that's before you right now?
"A. Yes.
"Q. And what was the amount by his name?
"A. $5,000.
"Q. What does that represent?
"A. Really, that's truck should be titled to me because I'll have to have a lien on it and he will have to work for me to pay it but Keith gave it to him direct so he would have swallow the $5,000.
"Q. When did Keith gave to him direct, what do you mean, [Kluczarov] gave to Keith directly another truck?
"A. No, same truck.
"Q. He gave him your Suburban?
"A. Never received title, no.
"Q. Do you have any other calculations on that document?
"A. Yes, we have, I think December, closes December of '97, we have $8,000 because this deal went before actually the end of the year. So we have $8,000 from one of the bills he submit to us, $8,750.
"Q. On the document in red pen, who wrote paid in December 23, 1997?
"A. I did.
"Q. After you had the amount of the GMC Suburban, the hands-free kit and the plow and the $10,000 and all the credits and pluses or minuses here, money owed to you as of March 2, 1998, on the sale of the Suburban to [Kluczarov], $8,750, to your knowledge, have you received any other monies from [Kluczarov] to reduce that, any other services to trace or reduce that amount?
"A. No.
"Q. If [Kluczarov] claims that he owes you only $4,325, is that accurate?
"A. No."
 {¶ 23} Upon cross examination, Austin testified:
"Q. Isn't the reason that you let [Kluczarov] go was because he started asking you in the weeks before September 21 for his percentage on Ridge Road?
"A. Never happen.
"Q. Never asked you for his percentage?
"A. Never.
"Q. Didn't [Kluczarov] ask you at one point in time to offset his percentage from what he owed you on the Suburban?
"A. Never, that never happened.
"Q. Isn't the reason you let [Kluczarov] go was because he was insisting that you pay him?
"A. Never happen."
 {¶ 24} Austin was shown Defendant's Exhibit 36A consisting of several pages of a legal pad with handwriting in ink. On the pages are dates, items, dollar amounts, and calculations.
"Q. Circle for me everything that is your writing here in blue pen, circle whatever is your writing.
"(Witness complying with request.)
"Q. Now, you didn't circle anything on the first page. * * * And on the second page, you circle an amount?
"A. Right.
"Q. * * * $4,325 that you had came (sic) up with?
"A. Well, this is could be bargain to sit and write any number that you want to bargain with somebody.
"* * *
"A. Sure, I did write this number.
"Q. * * * you have [written] $4,200 and you have JDY is $125, for a total of $4,325. What does that 4,325 mean?
"A. I don't know.
"* * *
"Q. Isn't $4,325 what he owed you on the Suburban? Wasn't that settling all your accounts except the Suburan and percentage?
"A. No, doesn't say this here.
"* * *
"Q. This document represents a settling of accounts at that point in time, does it not?
"A. Yes, except my vehicle, it doesn't say here anything about the Suburban.
"Q. On the [second] page next to what you circled, do you see something that says truck and says down below say [Bal], balance Chevy, $2,000, can you read those letters on there?
"A. Yes, $2,000.
"Q. Does balance, is this actually balance to you?
"A. I don't know, Bal.
"Q. Were you discussing the Chevy and the truck that [Kluczarov] had given Keith?
"A. No, could be my dump truck, Chevy could be any other vehicle that's sold.
"Q. Did you sell [Kluczarov] $2,000, did you and [Kluczarov] have any business over your dump truck, did he buy it from you?
"A. No.
"Q. Did you sell it to him?
"A. This document is not all sale. I don't see anything here telling me that I sold anything. I see [Kluczarov]'s writing, could be added in * * *. I don't know what this is, I have no clue.
"Q. Well, you do understand that you have said, you caused this writing in front of you here?
"A. That is right next to where balance Chevy, $2,000."
 {¶ 25} The testimony continued with discussion about who wrote which writings on the paper and what the writings meant. Then Austin testified:
"Q. So you settled up on that day?
"A. No, I didn't settle on that, I don't have anything here written to Suburban. Show me something here saying related to the Suburban.
"Q. What other Chevy are we dealing with besides the Chevy Suburban that might have a balance of $2,000?
"A. Maybe he have maybe my dump truck, maybe something else is nothing specific for GMC, GMC whole different, we have calculations, you have paper how everything is set.
"Q. We have two trucks here we are talking about here, a balance for the Chevy and we agreed [Kluczarov] bought the Suburban from you. Are you asking him to pay you?
"A. GMC not Chevy. I have Chevy truck and I have GMC Suburban. That is all different, two different machines.
"Q. Another truck you have indicated here too?
"A. I don't know what kind of truck.
"Q. How many trucks did you have dealings with?
"* * *
"A. [Kluczarov], it's one truck GMC.
"Q. And so your Suburban was GMC Suburban?
"A. Yes.
"Q. There is another truck up here?
"A. But not GMC. I didn't answer trying to push to, it's not GMC, I have GMC invoices, I have GMC paper somewhere else.
"* * *
"Q. We agreed that [Kluczarov] agrees that at that point in time, he owed you $4,325 for the Suburban?
"A. Not the Suburban.
"Q. Won't you even accept that [Kluczarov] owed you another $4,325 for the Suburban on that day?
"Mr. Pelagalli: Objection.
"The Court: I think it's been done a couple times.
"Q. Final question about this. And then after you came to this $4,325, [Kluczarov] asked you to deduct the $4,325 that he owed you for the Suburban from his percentage, did he not?
"A. Never heard about percentage until letter came in the mail. After I fired him. Never heard about hours claim, I don't know why he is doing it but he never, ever state to me, he sent me a letter, you are his friend, you could sent me a letter, say my client needs percentage, you have to pay him. Never received anything until the date after when I received the first letter came with it, I think percentage was second letter came with hours, no percentages. First one came percentage, no hours, second one came hours, no percentages. But if you put together, they match exactly to the number in both of them."
 {¶ 26} Later in the proceedings, Kluczarov testified that Defendant's exhibit 36A was a worksheet indicating how much was owed on the Suburban; Kluczarov stated that the $4,325 figure written by Austin on page 2 was the amount Kluczarov owed Austin for the Suburban. Kluczarov testified that he admitted owing the $4,325 on that day. When asked about what Austin owed him, Kluczarov stated that:
"A. I wanted to take the percentage to clear up the Suburban issue, get that cleared, out of the way. He said, no, keep the percentage for the end. That way you have a larger amount, we will take care of it then.
"Q. So you wanted to offset some of that money that you owed him from what he owed you?
"A. Yes."
 {¶ 27} Kluczarov continued to testify regarding the amount of money allegedly owed to him by Austin, stating:
"My bookkeeping was a nightmare, trying to keep everything straight. Every time I submitted a bill to Robert, he would say that he paid it, he paid it. Then I would have to go back and start all over and have to prove to him every time what was paid, what wasn't paid and then partial payments, it was just horrendous. They never matched the bills."
 {¶ 28} On cross examination, Kluczarov testified that:
"A. * * * Robert said he would pay me at the end. I asked about it again in July when we met to settle the score on the Suburban and on billing from $5,000 I asked him about it, that's what we wrote on paper saying everything was clear and paid and I know I asked him for that percentage right then and there, and I said let's settlement up about the Suburban at this point.
"Q. And he wanted to do it, your percentage coming at the end. You're talking about Defendant's Exhibit 36A which is previously identified?
"A. Yes.
"Q. And that one was to settle all the accounts?
"A. It was supposed to with the exception of the percentage which again, I asked about, he wouldn't write it.
"* * *
"Q. * * * [A]t or about this time, late '97, early '98, is that when you bought the Suburban and snow plow and cell phone from Robert?
"A. I didn't buy the phone from him.
"Q. At the end of '97, early '98 at that time, the Suburban and snow plow from Robert Austin?
"A. The Suburban I received in November.
"Q. Is that late '97?
"A. Yes.
"* * *
"Q. did you actually, physically give any cash to Robert for that purchase?
"A. He received my truck.
"Q. Is the answer no?
"A. No.
"* * *
"Q. The amount of 94 GMC was $18,000, you agreed on that price?
"A. Yes. [I disagree with the $750 for the cell phone. It was not part of the deal.]
"Q. The snow plow was $3,000?
"A. No, the snow plow was $2,500.
"* * *
"Q. According to [Exhibit 36A], and to [Austin], you owe $8,750 for the package, is that correct?
"A. That's what it says."
 {¶ 29} The above testimony of Austin and Kluczarov are just a small portion of the evidence in this case. There was much testimony regarding contractors and subcontractors, delays and changes, jobs botched and other jobs lost due to the problems between these parties. There is a box of physical evidence consisting of datebooks, handwritten accounts, bills, statements, checks, and more. The parties, when testifying, were unable to agree regarding the debt owed for the Suburban and the snowplow; however, it is Austin's position that because Kluczarov stated on the stand that he owed $4,285, then the jury should have awarded that amount to Austin. The jury's failure to do so, according to Austin, can only be due to inflamed passion and prejudice regarding race, even though there was a question of offsetting debts. Sorting through all that evidence and testimony was left to the jury as finders of fact. Austin's Exhibit 21 is a handwritten document written by Austin purporting to bind Kluczarov to the purchase of the Suburban and the snow plow; however, as stated earlier, it does not contain Kluczarov's name or signature and has no contract terms contained within it. There is also conflicting testimony regarding the lists and calculations written upon Exhibit 36A. We find there is substantial evidence upon which reasonable minds could come to different conclusions on the issue of the Suburban and snow plow, and the denial of the motion for a JNOV based upon this argument was proper.
 {¶ 30} Austin also argues that a JNOV was proper because the jury awarded Kluczarov punitive damages and attorney's fees for fraud when there was no evidence that Austin committed a fraud. Austin refers this court to the testimony of witnesses who stated that they had no knowledge of any attempt to defraud on the part of Austin. The jury instructions on the issue of fraud were:
"Fraud or misrepresentation is a * * * deception practiced with a view towards gaining an unfair or unlawful advantage. * * * [I]t's a false representation of the facts whether by words, conduct or concealment that misleads and is intended to mislead another so that he/she relies on it to his injury. * * * [A party has] to prove by the greater weight of the evidence each of the following elements to prevail upon it's (sic) claim of fraud. No. One, false representation of the facts was made by [the other party] with knowledge of it's (sic) falsity or whether such utter disregard and recklessness about it's (sic) falsity that knowledge may be concluded.
"No. Two; the representation was material to the transaction.
"No. Three; the representation was made with the intent of misleading plaintiffs into relying upon it.
"No. Four; [the complaining party was] justified in relying on the representation and did, in fact, so rely.
"No. Five; [the complaining party was] injured and the injury was proximately caused by [his/her] reliance on the false representation. * * *.
"The representation must be material, that is, it must be important, necessary or having influence on the transaction. It has to be so substantial and important that it influenced [the] person to whom it was made.
"A representation is false when it is not substantially true. The truth or falsity of a representation depends on the natural and obvious meanings of the words taking into consideration all the surrounding circumstances.
"A person knows a representation is false when he is aware it is not substantially true.
"A representation is made with utter disregard and recklessness when the person who made it is totally careless or indifferent to the consequences or the risk that the representation will cause the person whom it was made to do something or not do something. If the person has no knowledge of the fact but asserted it as true when it was false, you find that he/she made the a (sic) representation with utter disregard or recklessness. A representation recklessly made without knowledge of the truth is the same as a false representation knowingly made.
"A person intends to mislead another to rely on a representation when it is his/her purpose to mislead. A person's intent is known only to himself unless he/she expresses it to others or by indicating it by his or her conduct. Intent is determined from the way in which the representation is made, the means used and all the facts and circumstance[s] in evidence.
"There is justifiable reliance in a representation when a person of ordinary care relies on it under the same or similar circumstances.
"[The complaining party] must be directly damaged by the reliance on the representation. This means that the damage was cause by representation in a natural and continuous sequence without which the damage would not have occurred.
"Expressions of opinions, even though false, are not a basis of fraud. Boastful assertions or highly exaggerated descriptions or claims are puffing or bragging and are not false representations, which would constitute fraud. Fraud or misrepresentation must be proven to you by a greater weight of the evidence."
 {¶ 31} The record indicates that there were no objections to this instruction. The jury's interrogatory on this issue stated: "Did [Austin] commit fraud by promising a percentage of the [value] of home as manager, coordinator for two houses[?]" The jury responded "yes" and then awarded punitive damages and attorney's fees. The punitive damages amounted to $4,230.25.
 {¶ 32} Based upon the instructions, particularly the portion stating, "[a] person's intent is known only to himself" unless the intent is demonstrated or verbalized, we cannot find that the witness testimony was dispositive on the issue of fraud. It is not an element of fraud that someone other than the defrauder must have knowledge of the intent to defraud. Therefore, the denial of a JNOV upon this issue was proper.
 {¶ 33} Civ.R. 59 allows a trial court to grant a new trial upon the motion of either party. Pursuant to Civ.R. 59(A), a new trial may be granted to all or any of the parties and on all or part of the issues upon the following grounds: (1) irregularity or abuse of discretion such that a fair trial was prevented; (2) misconduct on the part of the jury or the prevailing party; (3) accident or surprise that the wronged party could not have guarded against; (4) excessive or inadequate damages resulting from the influence of passion or prejudice; (5) disproportion in the amount of the recovery; (6) the judgment is against the manifest weight of the evidence; (7) the judgment is contrary to law; (8) there exists newly discovered evidence that the party could not have discovered and produced using reasonable diligence; or, (9) an error of law brought to the attention of the trial court.
 {¶ 34} This Court reviews a trial court's ruling on a motion for a new trial for an abuse of discretion. Brooks v. Wilson
(1994), 98 Ohio App.3d 301, 304. "Abuse of discretion," in relation to the disposition of a motion for a new trial, implies an unreasonable, arbitrary, or unconscionable attitude upon the part of the court. Poske v. Mergl (1959), 169 Ohio St. 70, 75. Before this Court will disturb the trial court's decision regarding excessive or inadequate damages, the record must clearly demonstrate "highly improper argument by counsel tending to inflame [the] jury." Larrissey v. Norwalk Truck Lines, Inc.
(1951), 155 Ohio St. 207, 219.
 {¶ 35} Austin contends that he is entitled to a new trial because there are inadequate damages (the monies allegedly owed for the Suburban and snow plow) and an erroneous finding of fraud, resulting from the influence of passion or prejudice based upon Austin's race. We have addressed this issue of passion and prejudice based upon race in the second assignment of error. Above, we addressed the supposed inadequate damages regarding the Suburban and the snow plow and the finding of fraud. This Court finds that the trial court did not abuse its discretion in denying Appellants' motion for a new trial.
 Assignment of Error No. 3
"The trial court erred in allowing unqualified `experts' testify before the jury."
 {¶ 36} In the third assignment of error, Austin states that he challenged in a motion in limine, the testimony of John Henry Miller and Karl E. Kube as expert testimony, yet the trial court improperly allowed their testimony.
 {¶ 37} The trial transcript shows that John Henry Miller was called to testify, and was asked various questions about his profession as a carpenter and his time in the profession. Counsel moved "to qualify him as an expert in carpentry." The trial court permitted the testimony to go forth as from an expert. The transcript does not show that opposing counsel objected to the court's ruling at the time. However, later the transcript shows that Miller was asked, "Do you have an opinion as you sit here today, within a reasonable degree of construction certainty, whether Lew caused the problems with the trusses, the joists or the windows of this house?" Counsel for Austin then objected because, "I am not sure he's been offered as an expert" and the question related to a matter of opinion. The trial court overruled the objection, stating that the testimony was of an expert and the witness was permitted to offer opinion testimony of a factual matter.
 {¶ 38} Carl Kube was called to the stand and testified regarding his expertise and certification in basement excavation, and sewer and septic tank installation. Counsel moved "to qualify him as an excavation expert" and the trial court granted the motion. Again, at the time of his testimony, there was no objection entered into the record.
 {¶ 39} A ruling on a motion in limine is "a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue." State v.Grubb (1986), 28 Ohio St.3d 199, 201-202; McCabe/Marra Co. v.Dover (1995), 100 Ohio App.3d 139, 160. An appellate court does not directly review the rulings on motions in limine since the denial of a motion in limine is not a final decision of the trial court. State v. Hill (1996), 75 Ohio St.3d 195, 202-203. The evidence at issue in a motion in limine must be presented at trial, and a proper objection made, in order to preserve the error for appeal. State v. Brown (1988), 38 Ohio St.3d 305, paragraph three of the syllabus. Thus, the failure to raise the issues advanced in the motion in limine at trial waives the right of the objecting party to raise them on appeal.Grubb,28 Ohio St.3d at 203. Austin did not object at trial to the two witnesses as experts; where he did object it was regarding Miller's answer to a particular question and not to his expert status. Consequently, we must overrule Austin's third assignment of error.
 Assignment of Error No. 4
"The trial court erred in denying summary judgment to appellants."
 {¶ 40} Austin filed a motion for summary judgment on May 31, 2001, which was denied by the trial court. In the motion, Austin claimed that there was no genuine issue of material fact regarding the counterclaims arising from an oral contract, the lien filed on one parcel of the real property, and the issue of monies owed to Austin by Kluczarov on the Suburban. These are issues which were adjudicated after the motion for summary judgment was denied; Austin did not prevail on these issues at trial.
"Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." Continental Ins.Co. v. Whittington (1994), 71 Ohio St.3d 150, syllabus.
 {¶ 41} This assignment of error is overruled.
 III. {¶ 42} Appellant's four assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.
Judgment affirmed.
Batchelder, J., concurs.
Carr, J., concurs in Judgment Only.