#23920-a-RWS

**2007 SD 117**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                   Plaintiff and Appellee,

  v.

REX GARD,                            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIMOTHY R. JOHNS
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota           Attorneys for plaintiff
                         and appellee.

THOMAS E. ADAMS of
Voelker and Adams
Deadwood, South Dakota        Attorneys for defendant
                         and appellant.

\* \* \* \*

ARGUED ON OCTOBER 1, 2007

OPINION FILED **11/14/07**

#23920

SABERS, Justice.

[¶1.]        Rex Gard entered into a partnership to develop properties with Dr. Barry Smith and Dr. Rick Little.  During the course of this partnership, Gard opened credit accounts in the names of his partners, allegedly without their permission.  He also received money from the partnership to pay the partnership's bills, but kept the money instead.  He was indicted on multiple charges of theft, forgery and a single count of conspiracy.  A jury found Gard guilty of thirteen counts of theft, six counts of forgery, and the sole count of conspiracy to commit grand theft.  After the judge consolidated the theft counts into a single count and ordered the various sentences to run consecutively, Gard's prison sentence totaled 65 years. He appeals raising multiple issues.  We affirm.

## FACTS

[¶2.]        Gard was a contractor in Wyoming doing business as Planet Builders. Gard befriended Smith from Spearfish, South Dakota.  In 2003, Smith hired Gard to finish building his home after Smith had problems with his contractor.  Gard moved to South Dakota with his Planet Builders crew and finished the construction on Smith's home.

[¶3.]        According to the State, after Gard completed Smith's home he "wanted further projects."  The State claimed Gard came up with the idea of building townhouses, while Gard claimed it was a mutual decision.  In any event, Smith and Little took steps to form a corporation, S & L Enterprises, in order to construct houses for profit.

-1-

[¶4.] S & L Enterprises never fully developed. The State claimed Gard was unhappy about being left out of the partnership because he and his company, Planet Builders, would be doing all the construction work. Gard convinced Smith and Little to include him and hire Planet Builders to do the construction. Thereafter, the group formed Dakota Development Properties (Dakota Development). Gard owned 30% of the company, while Smith and Little each owned 35%.

[¶5.] Smith and Little purchased two lots in the Sandstone Addition in Spearfish, South Dakota. Dakota Development planned to build a duplex on one lot, and the company obtained a construction loan through BankWest for the project. There was conflicting testimony regarding the manner in which Gard was to be paid. Gard claimed he was to receive payment through the construction loan, while Smith testified that Gard agreed to receive 30% of the project once it was sold, plus equity in the company. Little testified he thought Gard would receive payment through Planet Builders, plus 30% of the profit after the sale of the duplex, and equity in the company.

[¶6.] In February or March of 2004, Smith was diagnosed with cancer. Little became responsible for most of the day-to-day operations of Dakota Development. Little testified that Gard was to invoice for construction expenses and Little would write company checks to pay the invoiced amounts. Most of the time, Gard did not pay the construction expenses and instead kept the money. On some occasions, Gard would inflate the costs of supplies, receive the inflated price and not pay the bill.

[¶7.]       In July of 2004, the construction loan was almost gone, the work by Planet Builders cost more than the original estimate, and Little discovered a "stack of bills" in the company post office box that had not been paid. Some bills had been turned over to collection agencies. After Little discovered the late bills, Gard claimed Little told him to only invoice for labor and that Little would pay the other expenses and materials bills directly to the suppliers. According to Gard, he had already purchased $17,000 in materials using checks from his personal accounts and was forced to stop payment on one of the checks due to Little's new billing rule.

[¶8.]       Little and Smith confronted Gard about the unpaid bills. He initially claimed the bills were paid or that it was an accounting error by his wife, Karen Jacks.* Despite Little and Smith's repeated attempts to gain access to the checkbook, Gard refused. Smith and Little also discovered that Gard and Jacks had opened multiple accounts using the doctors' personal information and signing their names.

[¶9.]       Little testified that he received a phone call in September of 2004, where Gard admitted money was missing. However, Gard attempted to blame first Jacks and then Smith. Little informed the Spearfish police about the missing money and detectives interviewed Jacks. During an interview, Jacks claimed they had permission to use the doctors' personal information and sign their names. Detectives obtained a warrant and seized computers and paperwork from Gard's home.

---

*       Jacks was Gard's girlfriend at the time the company was formed, and they later married.

#23920

[¶10.] On October 5, 2004, Gard was charged with two counts of grand theft by misappropriation of funds by contractor, subcontractor or supplier. On November 4, 2004, he was indicted on the same counts. Three subsequent superceding indictments were filed, which resulted in Gard being charged with fourteen counts of grand theft, one count of conspiracy to commit grand theft, and seven counts of forgery.

[¶11.] A trial was held on October 18-25, 2006. The jury convicted Gard of thirteen counts of theft, six counts of forgery, and conspiracy to commit grand theft. At sentencing, the judge consolidated the thirteen counts of theft into one conviction. Gard admitted to a part II habitual offender information, which enhanced all counts. He was sentenced to the maximum enhanced penalty for all counts and the sentences were to run consecutively on all counts, except the conspiracy and one forgery count. This resulted in a 65-year prison sentence. Gard appeals. We restate the issues as follows:

> 1. Whether the circuit court erred by not dismissing the grand theft charges because Gard was an owner of Dakota Development and unable, as a matter of law, to steal from it.
>
> 2. Whether the circuit court erred by denying Gard's motion to consolidate the forgery charges.
>
> 3. Whether the circuit court erred by not dismissing the forgery charges because the element of intent was absent.
>
> 4. Whether the circuit court erred by not dismissing forgery counts 17 and 19 because all the elements of forgery were not established.
>
> 5. Whether Gard's sentence of 65 years in prison, effectively a life sentence, fails to consider the question of rehabilitation and constitutes cruel and unusual punishment.

## STANDARD OF REVIEW

[¶12.]     When reviewing a sufficiency of evidence claim, we determine "whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the Court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." State v. Owen, 2007 SD 21, ¶35, 729 NW2d 356, 367 (quoting State v. Mesa, 2004 SD 68, ¶9, 681 NW2d 84, 87). "A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." State v. Swalve, 2005 SD 17, ¶5, 692 NW2d 794, 797 (quoting State v. Phair, 2004 SD 88, ¶16, 684 NW2d 660, 665 (quoting State v. Downing, 2002 SD 148, ¶22, 654 NW2d 793, 800)).

[¶13.]     **1.     Whether the court erred by not dismissing the grand theft charges because Gard was an owner of Dakota Development and unable, as a matter of law, to steal from it.**

[¶14.]     The State claims Gard has waived this issue by failing to raise it to the circuit court. The record indicates Gard did not make a motion to dismiss based upon his claim that he was unable to steal from his own company or bring this claim to the circuit court's attention in any other manner. The motion to dismiss related to the charge for the excise tax reimbursement by Dakota Development that Gard never paid the State of South Dakota. However, Gard claims that this issue is properly in front of this Court by virtue of his not guilty plea. He claims his conviction places every element into question and this issue is capable of review.

[¶15.]      While SDCL 23A-22-4 provides that "[a] plea of not guilty puts in issue every material fact constituting" the charged offense, it does not automatically preserve for appeal all of the issues relating to material elements of the crime. "Ordinarily an issue not raised before the trial court will not be reviewed at the appellate level." State v. Hays, 1999 SD 89, ¶16, 598 NW2d 200, 203 (citing State v. Henjum, 1996 SD 7, ¶13, 542 NW2d 760, 763). "The trial court must be given an opportunity to correct any claimed error before we will review it on appeal." Id. "To preserve issues for appellate review litigants must make known to trial courts the actions they seek to achieve or object to the actions of the court, giving their reasons." State v. DuFault, 2001 SD 66, ¶7, 628 NW2d 755, 757 (quoting State v. Nelson, 1998 SD 124, ¶7, 587 NW2d 439, 443; SDCL 23A-44-13). Failing to raise an issue, thereby allowing the circuit court an opportunity to correct the claimed error, results in waiver of the issue. Id. Gard's failure to ask the circuit court to dismiss the theft charges on the specific ground that it was legally impossible for him to steal from his own partnership would waive the claim on appeal.

[¶16.]      However, this is a question which may arise again and one of public interest. Both parties fully briefed and argued the issue at oral arguments; therefore, we will address the issue. See In re J.D.M.C., 2007 SD 97, ¶27, 739 NW2d 796, 805 (citing Nature's 10 Jewelers v. Gunderson, 2002 SD 80, ¶19, 648 NW2d 804, 808-09 (Konenkamp, J., dissenting) (citing Hormel v. Helvering, 312 US 552, 557-58, 61 SCt 719, 721-22, 85 LEd 1037, 1041 (1941); Sharp v. Sharp, 422 NW2d 443, 445-46 (SD 1988))).

[¶17.] Gard claims there is insufficient evidence to convict him of grand theft by embezzlement because he was an owner of Dakota Development. He claims that under *State v. Reddick*, 2 SD 124, 48 NW 846 (1891), a partner cannot steal from his own partnership. Therefore, Gard argues the judge erred by denying his motion to dismiss the grand theft charges.

[¶18.] SDCL 22-30A-1 provides that "[a]ny person who takes, or exercises unauthorized control over, property of another, with intent to deprive that person of the property, is guilty of theft." *Reddick*, decided over 100 years ago, declared that a partner who misappropriates partnership funds does not commit embezzlement because "each partner is the ultimate owner of an undivided interest in the partnership property[.]" 2 SD 124, 48 NW at 847. The *Reddick* court explained that

> none of such property can be said, with reference to either partner, to be the property of another, and as no one can be guilty of . . . embezzling what belongs to him and of which he is legally entitled to the possession, the courts have uniformly held that a general partner cannot be convicted of embezzling partnership property which comes into his possession or under his control by virtue of his being such partner and joint owner.

*Id.* at 847. However, the rule that a partner cannot embezzle from his partnership has been rejected by the American Law Institute. People v. Sobiek, 30 CalApp3d 458, 466, 106 CalRptr 519, 525, *cert. denied*, 414 US 855, 94 SCt 155, 38 LEd2d 104 (1973). Additionally, the South Dakota code now defines "property of another" to include "property in which any person other than the actor has an interest upon which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property[.]" SDCL 22-1-2(36); *see also Sobiek,* 30 CalApp3d at 466 (noting that "[i]n Model Penal Code section 223.0(7) (POD 1962), 'property of

another' is defined to include property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property.").

[¶19.]    While the outcome of *Reddick* may have been the holding in the majority of courts in 1891, the law in most states today is that a partner can be found guilty of embezzlement when he misappropriates funds from his partnership. *See Sobiek*, 30 CalApp3d at 465-67; State v. Sylvester, 516 NW2d 845, 849 (Iowa 1994); State v. Siers, 248 NW2d 1, 6 (Neb 1976) (Uniform Partnership Act's legal entity theory of partnerships and statutory definition of embezzlement that includes property that is partly owned by another, permits a partner to be prosecuted for embezzlement from his partnership); State v. Larsen, 834 P2d 586, 590 (UtahCtApp 1992) (noting the legislature abandoned common law and passed statutes which allowed a partner to be convicted of theft when he steals partnership funds or property); State v. Webb, 824 P2d 1257, 1263 (WashCtApp 1992) (same).

[¶20.]    For example, Iowa, like South Dakota, once held a partner could not be convicted for embezzling partnership funds. *See Sylvester*, 516 NW2d at 846-47. More recently, the Iowa Supreme Court held that a partner could be found guilty if he embezzled from the partnership. *Id.* at 848. The Iowa court found the adoption of the Uniform Partnership Law defined "the nature of a partner's right in partnership property." *Id.* at 847.

[¶21.]    South Dakota adopted the Uniform Partnership Act (UPA) in SDCL ch 48-7A in 2001. In fact, a provision of the UPA specifically recognizes property acquired by a partnership is the partnership's property and *not* property of the

individual partners. SDCL 48-7A-203. As the Iowa court recognized, the trend in case law has been "away from recognizing a partnership as an aggregation of individuals and toward recognizing partnerships as separate legal entities." *Sylvester*, 516 NW2d at 849.

[¶22.] Changes in the law, such as SDCL 22-1-2(36) and the UPA have modified the law from the manner it existed when *Reddick* was decided. Therefore, a partner who misappropriates funds from the partnership can be convicted of embezzlement. *Reddick* is overruled, to the extent it conflicts with this decision.

[¶23.] Gard also challenges whether sufficient evidence exists to convict him of embezzlement. Gard was convicted of theft by embezzlement because he opened several credit accounts for Dakota Development using the personal information of both Smith and Little. He then invoiced Dakota Development for charges and did not pay the credit accounts. Gard claims he had permission to open these accounts and he did not have the intent to steal, but only intended to further the goals of the company by finishing the construction projects. He also alleges that he paid for much of the needed construction supplies with his own money and was merely getting reimbursed for his expenses when he invoiced Dakota Development.

[¶24.] In support of his theory, he cites SDCL 22-30A-16, which provides that "[i]t is an affirmative defense to a prosecution for theft that the defendant: . . . (2) Acted under an honest and reasonable claim of right to the property involved or that the defendant had a right to acquire or dispose of the property as he or she did." The State provided evidence that Gard knew he did not have an honest and reasonable right to open the credit accounts, charge goods and not pay the bills.

Specifically, John Ellingson, a salesman at Knecht's Home Center, testified Smith told Gard he could not sign his name on applications and that it was illegal. Little also testified that he told Gard not to use his name on credit applications. The State also introduced evidence that showed Gard invoiced for construction bills, yet the construction bills were never paid and Gard pocketed the money to further his gambling habit.

[¶25.] The jury heard the testimony and evidence and resolved the conflicting testimony against Gard. We view the evidence in the light most favorable to the verdict and there is sufficient evidence in the record to sustain a finding of guilt beyond a reasonable doubt. We affirm.

[¶26.] **2. Whether the court erred by denying Gard's motion to consolidate the forgery charges.**

[¶27.] After the verdict, Gard moved to consolidate the theft and forgery charges. The circuit court consolidated the theft charges because it seemed to be one scheme and plan by one invoice to fraudulently deprive Dakota Development and his partners of money. Nonetheless, the circuit court refused to consolidate the forgery charges. Gard alleges the circuit court should have consolidated his forgery charges into one count because the forgeries were really one act.

[¶28.] Gard relies on *State v. Johnston*, 478 NW2d 281 (SD 1991). In *Johnston*, this Court reversed eighteen of nineteen grand larceny convictions when Johnston had nineteen of his neighbor's cattle in his pasture. *Id.* at 285. There was no evidence that the cattle were taken at separate times or all at once and we followed the "well-established rule that in a series of takings from the same individual, there is a single theft if the takings are pursuant to one continuing

-10-

impulse, intent, plan or scheme, but multiple counts if each taking is the result of a separate independent impulse or intent." *Id.* at 283. Thus, there was insufficient evidence to support nineteen separate grand larceny convictions, since there was no evidence whether the cattle were taken "with a single sustained criminal intent or if each taking [was] the result of a separate independent impulse or intent." *Id.*

[¶29.] Johnston also alleged the nineteen violations of the brand statutes should be consolidated into one. He claimed that the "continuing plan or scheme" theory he advanced in the grand larceny argument also applied to seventeen counts of misuse or alteration of a brand. However, this Court rejected that argument saying that "the violation of the brand registration and use statutes is not a theft" and "'a continuing plan or scheme' theory is not applicable to this argument[,]" but determined the review is limited to whether or not there is sufficient evidence "to sustain a finding of guilty beyond a reasonable doubt on each count." *Id.* at 284.

[¶30.] In *State v. La*, the defendant unsuccessfully attempted to consolidate his two theft convictions. 540 NW2d 180, 185 (SD 1995). In contrast to *Johnston*, there was sufficient evidence on the record to establish two separate thefts. La asked the victim on two separate occasions to buy a non-existent interest in a poker table where La worked. *Id.* While affirming the lower court, this Court noted that the jury was instructed regarding each separate offense and proceeded to enter two separate guilty verdicts. *Id.*

[¶31.] Here, there is evidence to show six distinct credit applications that Gard applied for by signing his partner's names without their permission. The jury heard the evidence and entered a guilty verdict on each of the six counts. There is

nothing in the record that demonstrates the circuit court erred by refusing to consolidate the forgery counts.

[¶32.]    **3.    Whether the court erred by not dismissing the forgery charges because the element of intent was absent.**

[¶33.]    The State contends Gard waived this issue by not raising it. Gard did not move for a dismissal of the forgery charges, claiming the intent element was absent. We do not address this issue, which is raised for the first time on appeal. *Hays*, 1999 SD 89, ¶16, 598 NW2d at 203 (citations omitted).

[¶34.]    **4.    Whether the court erred by not dismissing forgery counts 17 and 19 because all the elements of forgery were not established**.

[¶35.]    Gard claims that he cannot be convicted of forgery count 17 involving Lowe's because there was no evidence regarding the location of the crime. The indictment alleged the crime occurred in Lawrence County, but Gard claims there was no evidence presented at trial to support that allegation.

[¶36.]    Venue is to be found by the trier of fact and need only be demonstrated by a preponderance of the evidence. State v. Sullivan, 2002 SD 125, ¶7, 652 NW2d 786, 788. A conviction will stand where proper venue can be inferred from the evidence. State v. Graycek, 335 NW2d 572, 574 (SD 1983).

[¶37.]    While Gard claims he filled out the Lowe's credit application at the counter at the Lowe's in Pennington County, there is evidence that Gard at least partially committed the crime in Lawrence County. Gard testified that he filled out the application at the store and he called Little from the store to get his social security number. However, Gard later admitted that he could not have called Little because it was Sunday and Little would not have been at his office that day. Kathy

Reasor, the credit coordinator for Lowe's, testified that she heard Gard speaking with an associate about setting up a credit account, that Gard received an application, but did not fill it out that day. She testified that she processed the application when Gard returned with it on a different day. When processing the application, she inquired why Little was requesting credit, but he was not there. Gard told her that Little was too busy to bring the application back and he told Gard to bring it back to Lowe's to process it.

[¶38.] Furthermore, there was testimony from Robert McKinstry, manager of UBC, that a similar procedure was used when applying for credit from UBC. McKinstry testified that Gard took the application and returned later to see if the credit account had been set up. When informed they had not received the application back, Gard called a phone number (later identified as his home phone number) and asked the person to fax the application to UBC.

[¶39.] If an "offense is committed partly in one county and partly in another county . . . the venue is in either county." SDCL 23A-16-8. The State need only prove venue by a preponderance of the evidence. *Graycek*, 335 NW2d at 574; State v. Greene, 192 NW2d 712, 715 (SD 1971). The testimony of Reasor and McKinstry shows there is sufficient evidence to infer at least part, if not most, of the forgery crime occurred in Lawrence County by a preponderance of the evidence.

[¶40.] Gard also claims that he cannot be convicted of forgery count 17 involving Knecht's because there was no evidence he intended to defraud. In addition to the general claims of issue 3, Gard also alleges the intent element is absent because the partners knew he was ineligible for credit, that the company

-13-

would operate on credit, Smith was out of town and Gard needed to purchase supplies and Smith ratified the signature upon his return.

[¶41.]     The State claims Gard failed to preserve this issue for appeal because he did not move for a judgment of acquittal on count 17 and the circuit court did not have an opportunity to decide the issue. We agree and as noted above, we do not decide this issue as it is raised for the first time on appeal.

[¶42.]     **5.     Whether Gard's sentence of 65 years in prison, effectively a life sentence, fails to consider the question of rehabilitation and constitutes cruel and unusual punishment.**

[¶43.]     Gard received the statutory maximum for all crimes and concedes the Legislature and sentencing court were acting within their individual powers to assign and impose the sentence. He argues that imposition of these sentences consecutively amounts to a cruel and unusual punishment and fails to consider rehabilitation.

[¶44.]     We use the following proportionality test to review a challenge to a sentence on Eighth Amendment cruel and unusual punishment grounds:

> [T]o assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends.

State v. Bonner, 1998 SD 30, ¶17, 577 NW2d 575, 580 (citing Harmelin v. Michigan, 501 US 957, 1000, 111 SCt 2680, 2704, 115 LEd2d 836, 868 (1991)).

[¶45.]     The sentencing court noted that Gard had two prior felonies for theft convictions and several other complaints had been lodged against Gard during the performance of his business. In Wyoming, Gard was being investigated for almost

$300,000 in unaccounted money. He has a history of theft that spans twenty years. The court noted that he is the type of person that preys on other people. Gard stole money from his partners, one of whom was seriously ill with cancer and unable to look out for himself. At oral argument, Gard's counsel acknowledged Gard would be eligible for parole at age 70. Given the fact that Gard's sentences were within the statutory maximums, his history of prior theft convictions and other complaints, the sentence does not constitute gross disproportionality.

[¶46.] Typically, our review does not address rehabilitation unless the sentence suggests gross disproportionality, which this sentence does not. *See* State v. Milk, 2000 SD 28, ¶10, 607 NW2d 14, 17. In any event, the sentencing court did consider rehabilitation when it said, "You don't have much of a conscience. I'm satisfied that if you got out tomorrow, you'd probably be doing it again one of these days. Whether you ever grow out of it, I don't know. I hope you do." Gard did not present any evidence that he could rehabilitate. *See* State v. Ramos, 1996 SD 37, ¶19, 545 NW2d 817, 821-22. Given the record, Gard has not demonstrated the sentence constitutes cruel and unusual punishment.

[¶47.] Affirmed.

[¶48.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.